**Joseph Mickey BROOKS, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 05–02–01393–CR.**

Court of Appeals of Texas,
Dallas.

April 28, 2004.

John J. Boyle, Attorney At Law, Dallas, for Appellant.

William T. (Bill) Hill, Jr., John R. Rolater, Jr., Asst. District Atty., Dallas, for State.

Before Justices JAMES, FITZGERALD, and LANG.

## OPINION

Opinion by Justice FITZGERALD.

Joseph Mickey Brooks was convicted by a jury of aggravated robbery and sentenced to sixteen years' imprisonment. In four points of error, appellant Brooks challenges the admission of the written statement of Samuel Hunter, a non-testifying co-defendant. For the reasons that follow, we reverse the judgment of the trial court and remand the cause for new trial.

### I.

#### BACKGROUND

The complainant [1] testified at appellant's trial. She lived in a Dallas apartment with her husband and two-year-old baby. On February 7, 2002, she drove her husband to work at 7:00 a.m., returning home at about 7:15 a.m. She parked her car and walked to the front door of her apartment. After unlocking the front door, she walked back to her car, got her baby, and re-

---

1. The complainant testified in this case using a pseudonym to protect her identity. We will refer to her only as "complainant."

turned to the apartment. When she turned to close the door, she was accosted by Hunter, armed with a semi-automatic gun. After telling Hunter no one was in the apartment and insisting she had no money, the complainant was pushed upstairs. After the complainant put her baby in bed, Hunter took the jewelry and rings she was wearing, except for her wedding ring. After Hunter started looking in her closet, the complainant saw appellant enter her bedroom, walk into the closet, and begin throwing clothes.[2] Minutes later, appellant, while still in the closet, asked the complainant where her purse was. She heard a third male downstairs holler "hey" and saw appellant leave the bedroom and go downstairs. Appellant and Hunter never talked to each other in the bedroom.

After expressing unusual interest in the complainant's graduation picture, Hunter sexually assaulted her. Hunter later told her he had been watching her for weeks and wanted a "relationship" with her. Shortly thereafter, Hunter placed her in the closet and left. After the police lifted Hunter's fingerprints from the scene and the complainant identified his photograph, Hunter was arrested and gave a written statement. (Exhibit A, attached). Appellant was arrested a month later; he also gave a written statement to the police. (Exhibit B, attached).

Appellant testified in his own defense. He admitted being present at the scene and taking jewelry he found in the com-

plainant's purse, but he denied knowledge of or participation in any robbery or sexual assault.

## II.

### CONTENTIONS

Appellant raises four challenges to the admissibility of Hunter's written custodial statement. Appellant objected on the grounds the statement was hearsay and its admission violated his rights under the Confrontation Clause. The State, acknowledging Hunter's statement constitutes hearsay, argues: (A) Hunter's confession met the standards for admission as a statement against penal interest under rule of evidence 803(24); (B) appellant waived his confrontation claim because he only made a hearsay objection at trial, not an objection based upon the Confrontation Clause; (C) rule 803(24) is a "firmly rooted" exception to the hearsay rule, and therefore the admission of Hunter's statement did not violate the Confrontation Clause; and (D) even if admission of Hunter's statement had been error, it was harmless beyond a reasonable doubt under Texas Rule of Appellate Procedure 44.2(a).

## III.

### ADMISSIBILITY OF CO-DEFENDANT HUNTER'S STATEMENT UNDER THE CONFRONTATION CLAUSE

### *Preservation of Error*

█ The State raises a threshold issue concerning appellant's preservation of er-

---

2. The record is somewhat ambiguous as to whether there is more than one closet in the complainant's bedroom. At trial, the prosecutor asked the complainant about the conduct of the two men in her room:

Q.: What happened after [appellant] was in your closet and the man with the tear drops, did he still have the gun?
A.: Yes.
Q.: What were they, what was he doing while [appellant] was in the closet?

A.: He was looking on my, in my *other closet.*
Q.: Looking in your *other closet?*
A.: *Yes,* they were looking everywhere.
However, she subsequently testified the two men looked in her "closet," and our review of the photographs of her bedroom indicate there is probably only one closet. We, therefore, assume for purposes of our review that appellant and Hunter entered the same closet.

ror. The State argues appellant did not invoke the Confrontation Clause when he objected to the admission of Hunter's statement. The State overlooks appellant's objection included in the following statements:

> The basis of my objection on the record is No. 1, it's hearsay. It's not a statement by my client. *"It doesn't afford me an opportunity to cross-examine, it doesn't afford my client the opportunity to cross-examine Mr. Hunter."* (Emphasis added.)

We conclude this objection, with its reference to the right to cross-examine the co-defendant, was sufficient to preserve appellant's confrontation complaint for review. *See Douglas v. Alabama,* 380 U.S. 415, 421–23, 85 S.Ct. 1074, 13 L.Ed.2d 934 (1965) (objection "ample and timely" to bring federal error to attention of trial court and enable court to take corrective action is sufficient to serve state interests and preserve federal error).

### The Constitutional Right of Confrontation

The fundamental issue presented in this appeal is whether a non-testifying co-defendant's custodial statement, made to a police officer during investigation of a crime and incriminating the defendant, is admissible against the defendant. We review the trial court's record de novo. *See Muttoni v. State,* 25 S.W.3d 300, 304 (Tex. App.-Austin 2000, no pet.). Because of the constitutional nature of this inquiry, we are guided and bound by the decisions and reasoning of the United States Supreme Court. U.S. CONST. art. VI, cl. 2; *see also M'Culloch v. Maryland,* 17 U.S. (4 Wheat.) 316, 427, 4 L.Ed. 579 (1819) (sovereignty of the state is subordinate to and controlled by U.S. Constitution); *Guzman v. State,* 85 S.W.3d 242, 258 n. 24 (Tex.Crim.App. 2002) ("We are required to follow the decisions and reasoning of the United States Supreme Court on federal constitutional issues.").

### The Roberts Standard

At the time of appellant's trial, a confrontation challenge to the admissibility of an out-of-court statement offered against the accused was governed by *Ohio v. Roberts,* 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980). In that case, the Court discussed the confrontation issues raised by hearsay and directed that the following requirements be met before the out-of-court statement could be admitted:

> In sum, when a hearsay declarant is not present for cross-examination at trial, the Confrontation Clause normally requires a showing that he is unavailable. Even then, his statement is admissible only if it bears adequate "indicia of reliability." Reliability can be inferred without more in a case where the evidence falls within a firmly rooted hearsay exception. In other cases, the evidence must be excluded, at least absent a showing of particularized guarantees of trustworthiness.

*Id.* at 66, 100 S.Ct. 2531. The requirement of unavailability was subsequently limited to hearsay statements made in the course of a prior judicial proceeding. *See White v. Illinois,* 502 U.S. 346, 353–54, 112 S.Ct. 736, 116 L.Ed.2d 848 (1992). Thus, after *Roberts,* to determine the admissibility of a statement subject to a confrontation challenge, we tested the statement's reliability. And under the *Roberts* standard, reliability could be shown in one of two ways: by the presence of a firmly rooted hearsay exception, or by the presence of particularized guarantees of trustworthiness, such that adversarial testing would be expected to add little, if anything, to the statement's reliability. 448 U.S. at 66, 100 S.Ct. 2531.

This standard was applied in several subsequent noteworthy decisions. *See, e.g., Lee v. Illinois*, 476 U.S. 530, 545–46, 106 S.Ct. 2056, 90 L.Ed.2d 514 (1986) (concluding "a co-defendant's confession inculpating the accused is inherently unreliable" and rejecting State's "interlocking confessions" argument, holding instead "when the discrepancies between the statements are not insignificant, the co-defendant's confession may not be admitted"); *see also Lilly v. Virginia*, 527 U.S. 116, 134, 119 S.Ct. 1887, 144 L.Ed.2d 117 (1999) (plurality opinion) (holding co-defendant's confession incriminating defendant was "not within a firmly rooted exception to the hearsay rule" under *Roberts* standard); *Idaho v. Wright*, 497 U.S. 805, 820–21, 110 S.Ct. 3139, 111 L.Ed.2d 638 (1990) (evidence must be "so trustworthy that adversarial testing would add little to its reliability").

### The Crawford *Standard*

While appellant's case was pending before this Court, the Supreme Court replaced the *Roberts* test with a new test, set out in *Crawford v. Washington*, —— U.S. ——, 124 S.Ct. 1354, —— L.Ed.2d —— (2004).[3] *Crawford* relates the history of the principle of confrontation from ancient Roman times through eighteenth century Europe, and from the early colonial period in America through the adoption of the Sixth Amendment and early cases decided under it. *Crawford*, 124 S.Ct. at 1359–63. Based upon this historical background of the confrontation principle, *Crawford* draws two inferences concerning the Confrontation Clause: (1) the "principal evil" targeted by the clause was the civil law's historic practice of using ex parte examinations as evidence against the accused; *id.* at 1363; and (2) the Framers would not have permitted out-of-court testimonial statements to be admitted into evidence against the accused unless the witness was unavailable and the defendant had had a prior opportunity to cross-examine the witness. *Id.* at 1365.

Given this understanding of the Framers' original intent concerning the Confrontation Clause, *Crawford* next examines the Court's own history of adherence to that intent. The Court concludes that its opinions have, for the most part, been faithful to the Framers' principles: testimonial statements have generally been admitted only when the defendant did have a prior opportunity to cross-examine the statement's maker. *Id.* at 1369. Conversely, the Court emphasizes it has "excluded accomplice confessions where the defendant had no opportunity to cross-examine." *Id.* at 1368.[4]

However, according to *Crawford*, use of the *Roberts* test had caused the rationale of the Supreme Court's cases to depart from the original intent of the Framers. *Crawford* declares the *Roberts* test is at once too broad (i.e., it applies the same analysis whether the out-of-court statement is testimonial or not), and too narrow (i.e., it admits ex parte testimonial statements "upon a mere finding of reliability"). *Id.* at 1369. Reliability, of course, was the crux of the *Roberts* test. But *Crawford* emphasizes that there is no general reliability exception to the Confrontation Clause. *See id.* at 1370. Instead, according to *Crawford*,

> [a]dmitting statements deemed reliable by a judge is fundamentally at

---

**3.** The judgment of the Court was unanimous; Chief Justice Rehnquist wrote a separate concurring opinion, in which Justice O'Connor joined.

**4.** The Court cited *Douglas* and *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), as examples of such exclusions.

odds with the right of confrontation. To be sure, the Clause's ultimate goal is to ensure reliability of evidence, but it is a procedural rather than a substantive guarantee. *It commands, not that evidence be reliable, but that reliability be assessed in a particular manner: by testing in the crucible of cross-examination.* The Clause thus reflects a judgment, not only about the desirability of reliable evidence (a point on which there could be little dissent), but about how reliability can best be determined.

*Id.* (emphasis added). *Crawford* deems the *Roberts* test inappropriate not only because its results were unpredictable, but also because its application had been demonstrated to admit testimony the Confrontation Clause plainly meant to exclude. *Id.* at 1371–72 (citing examples of accomplice confessions). In the end, *Crawford* declares, *Roberts* provided an "open-ended balancing test," and when courts allow such tests to replace constitutional guarantees, "we do violence to their design." *Id.* at 1373.

The threshold question imposed by *Crawford* is whether the proffered out-of-court statement is "testimonial" in nature.[5] Although the Court purposefully avoids drawing a comprehensive definition of the term, it identifies certain categories of out-of-court statements that definitely fall under the heading of testimonial statements. These categories include prior sworn testimony from a preliminary hearing, a grand jury proceeding, or an earlier trial. They also include police interrogations. *See id.* at 1374. According to *Crawford,* these types of statements bear the "closest kinship" to the abuses at which the Confrontation Clause was directed. *Id.*

Once the out-of-court statement is determined to be testimonial in nature, *Crawford* applies the principles gleaned from its inquiry into the Framers' intent. As *Crawford* emphasizes, "[w]here testimonial evidence is at issue ... the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination." *Id.* Moreover, "where testimonial statements are at issue, the only *indicium* of reliability sufficient to satisfy constitutional demands is the one the Constitution actually prescribes: *confrontation." Id.* (emphasis added). Whether the statement is otherwise reliable or whether it is a firmly rooted hearsay exception plays no part in the *Crawford* analysis.

### Application of the Crawford Standard

 *Crawford* applied the new rule, concluding the admission of the defendant's non-testifying spouse's testimonial statement constituted a violation of the Confrontation Clause:

> In this case, the State admitted [the wife's] testimonial statement against petitioner, despite the fact that he had no opportunity to cross-examine her. That alone is sufficient to make out a violation of the Sixth Amendment.

*Id.* In this case, Hunter's statement was testimonial as a matter of law. *See id.* ("testimonial" applies to police interrogations). Appellant had no opportunity to cross-examine Hunter either before or during trial. Thus, admission of the statement as evidence against appellant violated the Sixth Amendment. *See id.*

### IV.

#### HARM ANALYSIS

 Because we have identified a constitutional error, we must reverse the

---

5. The Supreme Court derived this term from the Confrontation Clause's language: the Clause is concerned with "witnesses," whom the Court identifies as those who "bear testimony." *Id.* at 1364.

judgment of conviction unless we determine beyond a reasonable doubt that the error did not contribute to appellant's conviction.[6] *See* TEX.R.APP. P. 44.2(a); *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); *Mendez v. State*, 56 S.W.3d 880, 893 (Tex.App.-Austin 2001, pet. ref'd). In making this determination, we do not focus on the propriety of the outcome of the trial. *McCarthy v. State*, 65 S.W.3d 47, 56 (Tex.Crim. App.2001). Instead, our task is to "calculate, as nearly as possible, the probable impact of the error on the jury in light of the other evidence." *Id.* The question is whether the State has proved beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained. *Satterwhite v. Texas*, 486 U.S. 249, 256–57, 108 S.Ct. 1792, 100 L.Ed.2d 284 (1988); *Wesbrook v. State*, 29 S.W.3d 103, 119 (Tex.Crim.App.2000).

■ If there is a reasonable likelihood that the error materially affected the jury's deliberations, then the error is not harmless beyond a reasonable doubt. *Wesbrook*, 29 S.W.3d at 119. The fact that the legally admitted evidence is sufficient to support the verdict does not demonstrate the error was harmless. *Id.* (quoting *Satterwhite*, 486 U.S. at 258–59, 108 S.Ct. 1792). However, the error may be harmless when the lawfully admitted evidence of the defendant's guilt is overwhelming. *See Simpson v. State*, 119 S.W.3d 262, 269–71 (Tex.Crim.App.2003); *Guidry v. State*, 9 S.W.3d 133, 151 (Tex. Crim.App.1999).

■ Appellant was prosecuted as a party to the aggravated robbery. In this situation, for the State to prove appellant was guilty as a party, it was required to prove that:

> acting with intent to promote or assist the commission of the offense, he solicit[ed], encourag[ed], direct[ed], aid[ed], or attempt[ed] to aid the other person to commit the offense [of aggravated robbery].

TEX. PEN.CODE ANN. § 7.02(a)(2) (Vernon 2003). Hunter's confession stated appellant: (1) intended to commit a robbery, (2) selected the victim and the location of the robbery, (3) led the group to the destination, (4) furnished the transportation to and from the scene, and (5) checked out

---

**6.** The Supreme Court did not conduct a harm analysis in *Crawford* because the State had not challenged the Washington court of appeals' conclusion that the confrontation violation was not harmless. *Crawford*, —— U.S. at ——, n. 1, 124 S.Ct. at 1359, n. 1. The facts in that case showed petitioner Michael Crawford stabbed Lee, the man who allegedly tried to rape Crawford's wife, Sylvia. Police questioned Crawford and Sylvia. After giving them their *Miranda* warnings, the police obtained two taped statements. The suspects' first statements related that the three visited at Lee's house, that Crawford left to buy alcohol, and, upon his return, Crawford discovered Lee making sexual advances toward Sylvia. Crawford then stabbed Lee twice. *State v. Crawford*, 147 Wash.2d 424, 54 P.3d 656, 658 (2002). The suspects' second set of statements, taken several hours later, presented a different scenario. Each related that a sexual assault had occurred several weeks earlier and that, after Lee's name was mentioned on the night of the stabbing, Crawford had become upset. Sylvia led Crawford to Lee's apartment. During an ensuing fight, Lee was stabbed and Crawford's hand was cut. Crawford stated Lee may have had something in his hand *when Crawford stabbed Lee*, whereas Sylvia implied Lee may have grabbed for something *after Crawford stabbed Lee*. *Id.* Crawford was charged with assault and attempted murder; he claimed self defense. *Id.* Sylvia did not testify because of the marital privilege. *Id.* The State offered Sylvia's tape-recorded statements to show the stabbing was not in self-defense; the trial court admitted the statements, concluding the statements were sufficiently reliable to overcome confrontation concerns. *Id.* Crawford was convicted.

the complainant's house and car. In essence, Hunter's statement constituted direct proof that appellant had the intent to commit an aggravated robbery and actively participated in its planning and execution. A co-defendant's statement that "expressly implicate[s]" a defendant is "powerfully incriminating." *Richardson v. Marsh*, 481 U.S. 200, 208, 107 S.Ct. 1702, 95 L.Ed.2d 176 (1987). This statement was crucial to the State's case: it provided the only direct evidence to show appellant's culpable mental state and his active participation as a party prior to and during the aggravated robbery. *Compare Lilly v. Commonwealth*, 258 Va. 548, 523

S.E.2d 208 (1999) (on remand from *Lilly v. Virginia*), and *People v. Lee*, 164 Ill. App.3d 155, 115 Ill.Dec. 217, 517 N.E.2d 628 (1987) (on remand from *Lee v. Illinois*); *compare also State v. Crawford*, 107 Wash.App. 1025, 2001 WL 850119 (2001).[7]

█ The State cross-examined appellant extensively on the entire contents of Hunter's statements in an effort to impeach him. Appellant's version of the facts, thus, was subject to scrutiny and challenged in front of the jury. However, Hunter's version was not subject to that type of scrutiny because appellant had no opportunity to cross-examine Hunter.[8] Thus, Hunter's

---

**7.** The application of the *Crawford* standard, rather than the *Roberts* standard, in the *Lee* and *Lilly* cases would have yielded the same holding, i.e., that the admission of the co-defendant's statement violated the Confrontation Clause. The subsequent harm analysis conducted in each case pursuant to the Supreme Court's remand order resulted in holdings that the co-defendant's confession contributed to the defendant's conviction, and, therefore, the error was not harmless. *Lilly v. Commonwealth*, 523 S.E.2d at 210; *People v. Lee*, 115 Ill.Dec. 217, 517 N.E.2d at 632. In *Crawford*, the Washington court of appeals held Sylvia's statement refuted the defendant's claim of self defense and, therefore, its admission was not harmless. *State v. Crawford*, 107 Wash.App. 1025, 2001 WL 850119, at *6. This holding was not addressed by the Washington Supreme Court or challenged in the United States Supreme Court. *Crawford*, —— U.S. at —— n. 1, 124 S.Ct. at 1359 n. 1.

**8.** The Sixth Amendment to the United States Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him." U.S. CONST. amend. VI. The Confrontation Clause is made applicable to the states through the Due Process Clause of the Fourteenth Amendment. *Pointer v. Texas*, 380 U.S. 400, 403–05, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965). The principal concern of the Confrontation Clause is "to ensure the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversary proceeding before the trier of fact." *Maryland v. Craig*,

497 U.S. 836, 845, 110 S.Ct. 3157, 111 L.Ed.2d 666 (1990). The Supreme Court has declared that "the absence of proper confrontation at trial 'calls into question the ultimate integrity of the fact-finding process.'" *Roberts*, 448 U.S. at 64, 100 S.Ct. 2531 (quoting *Chambers v. Mississippi*, 410 U.S. 284, 295, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973)).

> A defendant's right to confrontation accomplishes at least three fundamental purposes of our justice system. This right:
> (1) insures that the witness will give his statements under oath—thus impressing him with the seriousness of the matter and guarding against the lie by the possibility of a penalty for perjury; (2) forces the witness to submit to cross-examination, the "greatest legal engine ever invented for the discovery of truth"; [and] (3) permits the jury that is to decide the defendant's fate to observe the demeanor of the witness in making his statement, thus aiding the jury in assessing his credibility.

*California v. Green*, 399 U.S. 149, 158, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970) (footnote omitted). These testimonial guarantees, not ends in themselves, are intended to achieve the ultimate goal of reliability of the evidence weighed by disinterested fact finders. The right of confrontation ensures the fairness and accuracy of criminal trials. *See Pointer*, 380 U.S. at 404–05, 85 S.Ct. 1065.

> The Supreme Court has emphasized that cross-examination was included in the right of an accused to confront witnesses against him:

statement constituted unchallenged substantive evidence to prove appellant's guilt of aggravated robbery and contradictory evidence to impeach appellant's defense. This case is not one where "cross-examination would be of only 'marginal utility.'" *See Guidry,* 9 S.W.3d at 150 (quoting *Wright,* 497 U.S. at 819–20, 110 S.Ct. 3139).

Further, the prosecutor stressed Hunter's statement in the final argument to the jury, stating:

> *Samuel Hunter says in his statement, we went there to rob her.* Why can you believe Samuel Hunter? Because almost every other word of that is corroborated by the physical evidence and the victim. (Emphasis added.)

The State clearly emphasized critical portions of Hunter's statement in its plea to the jury to return a guilty verdict.[9]

The State argues that any error in the admission of Hunter's statement was harmless because appellant's own confession demonstrated he was guilty of aggravated robbery as a party and because the complainant identified appellant as one of the robbers.[10] The State concludes that "abundant other evidence established appellant's guilt" and, therefore, any error was harmless beyond a reasonable doubt. We disagree.

The State's first argument—that appellant's own statement established he was guilty of armed robbery—is disingenuous. Appellant's statement relates that the three men were together in appellant's girlfriend's truck when "[Hunter] told me to take him over his girlfriend house so he [Hunter] can get some money." Appellant's statement admitted committing theft, but specifically *denied* involvement in any robbery or sexual assault. Those portions of Hunter's statement that bear upon appellant's participation "are not thoroughly substantiated" by appellant's own confession, and the discrepancy between the statements is not "insignificant." *See Lee,* 476 U.S. at 545, 106 S.Ct. 2056; *Zarychta v. State,* 961 S.W.2d 455, 459 (Tex.App.-Houston [1st Dist.] 1997, pet. ref'd). Further, appellant's evidence required the trial court to submit jury instructions on the law related to theft and robbery, offenses which were lesser-included offenses of the primary offense of aggravated robbery. Thus, appellant's defensive evidence clearly does not demonstrate appellant's guilt of aggravated robbery.

As to the State's second argument, the complainant's testimony focused almost entirely upon Hunter's individual conduct. Although she saw appellant briefly rummage through her closet and inquire about her purse, she did not see appellant with a gun or see Hunter wield his gun in open view in appellant's presence, and she never heard any conversation between Hunter

And probably no one, certainly no one experienced in the trial of lawsuits, would deny the value of cross-examination in exposing falsehood and bringing out the truth in the trial of a criminal case. The fact that this right appears in the Sixth Amendment of our Bill of Rights reflects the belief of the Framers of those liberties and safeguards that confrontation was a fundamental right essential to a fair trial in a criminal prosecution.

*Id.* at 404, 85 S.Ct. 1065 (citation omitted).

9. Defense counsel acknowledged to the jury that his efforts to contend with Hunter's statements were largely ineffectual. As a result, the matters asserted in that statement went unchallenged and untested.

10. The State also argues that the error is harmless because appellant received "only a sixteen year sentence." In other words, the State focuses upon the punishment imposed. The question before us is whether we can conclude the admission of Hunter's statement did not contribute to his *conviction.*

and appellant. It is undisputed appellant was not present when Hunter robbed her of her jewelry and sexually assaulted her.[11]

Thus, the complainant's testimony was circumstantial evidence of appellant's guilt as a party to aggravated robbery. However, under these circumstances, we conclude that unchallenged direct evidence provided by a criminal cohort is "clearly" more persuasive to a jury than challenged circumstantial evidence. *See Muttoni*, 25 S.W.3d at 308 (although State offered documentary circumstantial evidence of defendant's participation in theft, only non-testifying cohort's statement implicated defendant through "eye-witness evidence," causing unchallenged accusation to be more persuasive than records); *see also Mendez*, 56 S.W.3d at 893 (although "considerable circumstantial evidence" linked defendant to crime, non-testifying co-defendant's direct allegation that defendant planned murders, provided weapons, entered victims' house, and fired gun was more persuasive to jury). Accordingly, we conclude the admission of Hunter's statement probably did contribute to his conviction. *See* TEX. R.APP. P. 44.2(a).[12]

When we assess the overall strength of the State's case, we conclude that without Hunter's statement, the State's case was not overwhelming. Hunter's statement incriminated appellant and was central to the State's case against him. *See Delaware v. Van Arsdall*, 475 U.S. 673, 684, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986) (when adjudging harm associated with inability to confront, courts should consider factors including whether testimony was cumulative, presence or absence of corroboration, and overall strength of prosecution's case). Without Hunter's confession, there is no direct evidence appellant had the prior intent to commit aggravated robbery or planned and participated in an aggravated robbery. *See also Douglas*, 380 U.S. at 419–20, 85 S.Ct. 1074 (co-defendant's statement provided only direct evidence of facts, thus forming crucial link in proof of appellant's intent and participation in crime); *Bruton*, 391 U.S. at 137, 88 S.Ct. 1620 (co-defendant's statements were "devastating" to defendant deprived of cross-examination). Given the totality of the circumstances, we find it impossible to say there is no reasonable likelihood that the State's use of Hunter's statement materially affected the jury's deliberations. *See Wesbrook*, 29 S.W.3d at 119; *Garcia v. State*, 919 S.W.2d 370, 380 (Tex.Crim.App. 1994). We, therefore, cannot conclude beyond a reasonable doubt that the admission of Hunter's statement did not contribute to the jury's verdict of guilty on the aggravated robbery charge. *See Mendez*, 56 S.W.3d at 893. We conclude the admission of that statement was harmful error.

---

11. During cross-examination, it was developed that the complainant apparently gave a written statement to the police in which she said Hunter entered her bedroom, but the other two men did not; she explained at trial, however, that she meant only Hunter entered her bedroom to assault her.

12. We note that even in non-constitutional cases, the admission of the out-of-court statement of a criminal cohort can be harmful error when the statement is the only direct evidence of the defendant's participation in the crime. *See, e.g., Zarychta*, 961 S.W.2d at 459–60 (co-defendant's statement that Zarychta directed him repeatedly to shoot victim was probably given great weight by jury when only other evidence of Zarychta's aid or encouragement was receipt for box of ammunition); *see also Cofield v. State*, 857 S.W.2d 798, 805 (Tex.App.-Corpus Christi 1993) (statement by Cofield's companion that they had smoked crack cocaine together before police arrived and arrested them was only direct evidence Cofield had possessed cocaine, where paraphernalia was found in Cofield's car but only companion possessed cocaine), *aff'd*, 891 S.W.2d 952 (Tex.Crim.App. 1994).

## V.

### CONCLUSION

For the reasons discussed above, we sustain appellant's points of error. In doing so, we note that the able trial court did not have the benefit of *Crawford* when Hunter's statement was admitted into evidence. Nevertheless, applying *Crawford*, we conclude the admission of Hunter's statement was error and the error was harmful. Accordingly, we reverse the trial court's judgment and remand this cause for new trial. Because of our disposition of the appeal, we need not address appellant's remaining arguments. *See* TEX. R.APP. P. 47.1.

### EXHIBIT A

Thursday morning about 7:15 a.m., Joseph, Chris and went into this girl's apartment to rob her. I went in first and hide in her kitchen while she was outside in her car. When she came in I heard the door lock and I came out with a gun and held her at gunpoint. From there I told her to go upstairs. She waited on the steps while I unlocked the door for Joseph and Chris. After that we all went upstairs, checked the house. I sat down and talked to her, lying to her, saying I had been watching her and her husband leave every morning.

Joseph was downstairs at this time, at the time, looking through her house. Then he went to her car and checked it. Came back in and left again. I went in the hallway and came back to her. After that I asked her did she give head. I don't know why, but I did. She gave me head. And then I told her to bend over so I could have sex with her. So I did and we left.

I went back as planned to Joseph's house and we got in his car, went looking for someone to rob. Then he said, I know where to go, and we went there.

### EXHIBIT B

I, Joseph Brooks, is in my girlfriend car. Joseph, Chris Wagner, Chico told me to take him over his girlfriend house so he Chico can get some money. So we go over to some apartments. We get into the apartments. I see this Mexican girl but I am not thinking this his girlfriend. Why I say that because I am in front of the apartment. Him and my cousin got out. My cousin starts to smoke a cigarette and walk with Chico, just to see where she stay and make sure it was not going to be that long. First, they were taking too long, so I got out of the car and walk through the apartment I saw my cousin and I said where is Chico. He said in there. I said he taking too long, so knock on the door.

Chico opened the door, we went inside. He said, here I come, so we sat down, one sofa. I, Joseph Brooks, got up and went into her closet and look in it. I, Joseph Brooks, took her purse that was in the closet. I look in it and got her rings in her purse. But what got me, the men's shoes in the closet. I told my cousin, let's go see what she look like and was he fucking her. I knock on the—he opened. I saw a Mexican girl with a baby newborn.

As I continued to walk, I noticed she was kind of scared, but I don't think of nothing right then until I started think about the gun. So, but it was not out at the time, I think, I am not for sure. His is like a shack to me. I saw him looking around her room for something, so I started to look also. This whole time, my cousin was just standing by the door. So I said, Chico, I am going to go, so come on. So he said, go ahead, here I come, and it says no a I come, so me and my cousin back downstairs. I went to the refrigerator to get something to drink. I got a soda. Started to walk out of the house. That when we heard her say, not in front of the baby. So I called Chico, ran out the door, got in the

car, drove around the apartment, and started to leave, but I didn't know what to think. When he got in the car I asked him what he was doing, he said something about some head. And he started to take a condom off.

I look away and said, I know you didn't. Chico, I know, not as Samuel. I didn't know that until now. I know he had a gun, but not on him at the time, because the times I see him with Tory, my used-to-be best friend, he would have one. But not in the house. I only know him for about a good month. The other friend from his brothers I, us, to his brother, I didn't know he was this kind of person, neither did Chris. And the gold that I took is, was, by a girlfriend of mine the day after the robbery and her name is Puveris White.

I don't know Chico by Samuel or whoever. I know him by Chico, and the tear drops on his eyes, and he is a bright person. We did not have sex with the woman but we did steal her property. I didn't see Chico have sex with her but he was in there for a long time. Me nor my cousin didn't go anywhere to robbery anyone or sex anybody, just to get some money from her and go. We didn't know her or of her.