In The
Court of Appeals
Sixth Appellate District of Texas at Texarkana

______________________________

No. 06-03-00216-CR
______________________________


TAMMY ROSE WIGGINS, Appellant
 
V.
 
THE STATE OF TEXAS, Appellee


                                              

On Appeal from the 115th Judicial District Court
Marion County, Texas
Trial Court No. F13,266


                                                 



Before Morriss, C.J., Ross and Carter, JJ.
Opinion by Justice Carter


O P I N I O N

            Tammy Rose Wiggins was convicted of capital murder and sentenced to life in prison. Her
only complaint on appeal is that the admission of hearsay statements made by her co-conspirator,
Glen Bethany, to testifying witnesses Mark Fish, Teresa Miller, and Wendy Bunn Troquille, violated
her Confrontation Clause rights as articulated in Crawford v. Washington, 124 S.Ct. 1354 (2004). 
Finding the co-conspirator statements on which she bases her appeal nontestimonial, we overrule
Wiggins' three points of error and affirm the trial court's judgment.
            Wiggins does not attack the sufficiency of evidence at trial, so a detailed recitation of the
facts of this case is not necessary. An in-depth summary of the evidence of this crime may be found
in this Court's opinion in Bethany v. State, 06-03-00185-CR. 
            In brief, the evidence adduced at trial showed that Tammy was involved in an extra-marital
affair with Bethany. Tammy and Bethany conspired to kill Tammy's husband, Randy Wiggins. 
Randy had filed for divorce from Tammy and intended to seek custody of their young child. In
exchange for his help in the murder, Bethany was to receive from Tammy the title to Randy's Lincoln
automobile. Randy and Tammy left a bar near the Louisiana/Arkansas/Texas state lines, and pulled
off the road near an oil well in Cass County, Texas. Bethany waited there until Tammy and Randy
arrived, then Bethany hit Randy at least twice in the head with a hammer, and cut Randy's throat. 
Bethany put Randy's body in a large toolbox in a pickup truck Bethany had stolen; Bethany dumped
the body on a county road in Marion County, then took the truck to Frierson, Louisiana, and set it
ablaze. 
Co-Conspirator Statements
            The evidence on which Tammy bases her Crawford complaints is as follows:
            Teresa Miller was the live-in girlfriend of Mark Fish at the time of Randy's murder. She
testified that Bethany and Tammy stayed with Miller and Fish. Miller heard Bethany and Tammy,
in Miller's kitchen, talking about Bethany getting the title to Randy's car in exchange for killing
Randy. Miller, while in the car with Tammy and Bethany, heard Tammy ask Bethany to kill Randy
so Tammy and Bethany "could be together." Miller did not hear Bethany respond to Tammy's
statement, but did hear Tammy say that, if Bethany did not kill Randy, Tammy would do it herself. 
After Tammy got out of the car, Bethany told Fish and Miller he would not kill "any man for a
woman." 
            Miller also said that Bethany told her specifics about the murder and that he asked her to take
him to recover the hammer used in the killing. After seeing coverage of Randy's death on the local
news, Bethany asked if Miller knew who the victim was. After Miller answered that she did not
know him, Bethany told her the victim was Tammy's husband. He described to Miller that Tammy
and Randy left a bar and came to a clearing in the woods, where Bethany waited. Bethany said he
struck Randy in the head with a ball peen hammer, stabbed him, cut his throat, put his body in the
toolbox, drove seventy-five miles away, and dumped the body. He took the title to the Lincoln from
Randy's wallet. Bethany then put his bloody clothes in the front of the truck, took the truck to
another location, and burned it. The description Bethany gave of the murder had not been mentioned
on the news broadcasts. After telling all this to Miller, he asked her to go with him to look for the
hammer. 
            Fish testified Bethany described the murder, using hand gestures to indicate cutting motions
to the throat. Bethany said the song, "Three Times a Lady" was his code for the murder, because he
had cut Randy's throat three times. Bethany asked Fish to help provide an alibi for Bethany and
Tammy. Fish testified he heard Bethany and Tammy talking in the kitchen; Bethany later told Fish
he had been "coaching" Tammy in case she was questioned by police detectives.
            Troquille testified that Bethany told her specifics about the murder event and that he asked
her to take him to recover the hammer used in the killing. Bethany told her the murder had been
planned and Tammy had asked him to participate. According to Troquille, Bethany said he waited
at a prearranged site, where Tammy arrived with Randy. Bethany said he struck Randy in the head
with a ball peen hammer, and the hammer flew out of his grip after the second blow. Bethany told
Troquille that "he was not going down for this crime alone" and afterward sent Tammy back to the
bar to establish an alibi. Bethany did not ask for Troquille's help in formulating an alibi, but said
that, if she would take him back to the murder scene and look for the hammer, she "would never
have to work another day in [her] life." Troquille said that the details Bethany told her had not been
mentioned on television news reports and that he had thrown in a lake the knife used in the crime.
Nontestimonial Statements Not Barred by Crawford v. Washington
            Wiggins's sole complaint is that the statements made by Bethany to Fish, Miller, and
Troquille are barred by Crawford. We disagree. The United States Supreme Court in Crawford held
that the Confrontation Clause in the Sixth Amendment to the United States Constitution barred from
admission into evidence testimonial statements of a witness who did not appear for trial unless the
witness was unavailable to testify and the defendant had had a prior opportunity for cross-examination. Crawford, 124 S.Ct. at 1365. Crawford concerns testimonial statements. Co-conspirator statements made in the furtherance of a conspiracy are nontestimonial. Crawford, 124
S.Ct. at 1367 ("[m]ost of the hearsay exceptions covered statements that by their nature were not
testimonial—for example, business records or statements in furtherance of a conspiracy"); United
States v. Reyes, 362 F.3d 536, 541 (8th Cir.), cert. denied, Burton v. United States, 124 S.Ct. 2926
(2004).
             Appellant is correct that Crawford "leave[s] for another day . . . a comprehensive definition
of 'testimonial.'" Crawford, 124 S.Ct. at 1374. However, the Court did note that "the term covers
. . . at a minimum . . . prior testimony at a preliminary hearing, before a grand jury, or at a former
trial; and . . . police interrogations. These are the modern practices with closest kinship to the abuses
at which the Confrontation Clause was directed." Id. 
            The Second Circuit Court recently construed Crawford as it pertains to co-conspirator
statements. "[S]tatements cited by the Court [in Crawford] as testimonial share certain
characteristics; all involve a declarant's knowing responses to structured questioning in an
investigative environment or a courtroom setting where the declarant would reasonably expect that
his or her responses might be used in future judicial proceedings." United States v. Saget, 377 F.3d
223, 228 (2d Cir. 2004).


 In Saget, a co-conspirator disclosed inculpatory statements to a
confidential informant. Noting Crawford's specific caveat that it only pertains to testimonial
statements, the Second Circuit Court pointed out that the co-conspirator in Saget made statements
to one he thought was an ally or friend, and there was no evidence the co-conspirator was trying to
shift blame away from himself. In this case, Bethany's statements are clearly nontestimonial. As in
Saget, they were not made in a setting where it might reasonably be expected the statements would
be used in judicial proceedings.
            Even though we have found these statements to be nontestimonial, we must still determine
the application of the Confrontation Clause concerning nontestimonial statements. The Supreme
Court did not specifically resolve this issue, stating "[w]here nontestimonial hearsay is at issue, it
is wholly consistent with the Framers' design to afford the States flexibility in their development of
hearsay law--as does Roberts, and as would an approach that exempted such statements from
Confrontation Clause scrutiny altogether." Crawford, 124 S.Ct. at 1374. A reasonable interpretation
of Crawford would exempt all nontestimonial statements from any Confrontation Clause scrutiny. 
Several courts have held that nontestimonial statements are still governed by Ohio v. Roberts, 448
U.S. 56 (1980). See Saget, 377 F.3d 223; Horton v. Allen, 370 F.3d 75, 84 (1st Cir. 2004); People
v. Cage, 120 Cal. App. 4th 770, 782 (Cal. Ct. App. 2004); State v. Manuel, 685 N.W.2d 525 (Wis.
Ct. App. 2004) ("we proceed, in an abundance of caution, to analyze Manuel's confrontation clause
claim under the Roberts analysis").
            In the context of a Confrontation Clause analysis, Roberts authorized the introduction of a
hearsay statement if it bore sufficient "indicia of reliability." Roberts, 448 U.S. at 66. A hearsay
statement is per se reliable under the Confrontation Clause if it falls within a "firmly rooted"
exception to the hearsay rule. White v. Illinois, 502 U.S. 346, 356 (1992). Even applying the
Roberts test, we hold these nontestimonial statements were admissible. 
            Here, Bethany made statements that were significantly self-inculpatory. The Texas Court of
Criminal Appeals has found statements against one's penal interest to be "extremely reliable." 
Dewberry v. State, 4 S.W.3d 735, 753 (Tex. Crim. App. 1999). Further, co-conspirator statements
are recognized as a firmly rooted hearsay exception. Bourjaily v. United States, 483 U.S. 171, 183
(1987); Bailey v. State, 804 S.W.2d 226, 231 (Tex. App.—Amarillo 1991, no pet.).
            Since co-conspirator statements are not testimonial, the Confrontation Clause does not give
the defendant the right to cross-examine a person who does not testify at trial and whose statements
are introduced under the co-conspirator hearsay exclusion. Reyes, 362 F.3d at 540–41, citing White,
502 U.S. at 356.
            Finally, the two cases Wiggins cites in support of her argument that Crawford and the
Confrontation Clause bar the testimony of Fish, Troquille, and Miller are inapposite. Brooks v.
State, 132 S.W.3d 702 (Tex. App.—Dallas 2004, no pet. h.); Hale v. State, 139 S.W.3d 418 (Tex.
App.—Fort Worth 2004, no pets.). Both involve statements from a codefendant (Brooks) or
accomplice (Hale) which were written and given to police during custodial interrogations. Clearly,
those statements were testimonial, as contemplated by Crawford, and not comparable to the
statements in the instant case.
            Wiggins' three points of error are overruled. We affirm the judgment.
 


                                                                        Jack Carter
                                                                        Justice
 
Date Submitted:          October 27, 2004
Date Decided:             November 18, 2004

Publish



 'Times New Roman', serif"> committed those grounds, and therefore, will deny the request of
the State to terminate the parent-child relationship, although [A.B.] will remain in the
conservatorship of the Department in anticipation that he will remain and complete
the program in Pegasus. I do not find that Ms. Palmer at this time is able to take
[A.B.] back or to provide a home for him, and it will be necessary for him to remain
in their conservatorship until such time as she does.
 
As to the other four children, the Department will remain as the Managing
Conservator of those children.

            The trial court's oral pronouncement meets the requirements of a final judgment in
accordance with Section 263.201(d) of the Texas Family Code. Tex. Fam. Code Ann. § 263.401(d). 
First, we note it expressly confirms the State's allegations and specifically finds that termination of
Palmer's parental rights would be in the best interests of the children. Second, the pronouncement
declares that TDPRS "will remain" the conservator of the children. Therefore, the trial court's oral
pronouncement constituted rendition of a final judgment on May 12, 2003, before the first
anniversary of the date the court first named TDHS temporary managing conservator for the children. 
Dismissal under Section 263.401(a), therefore, was not required, and the trial court's denial of the
motion to dismiss on those grounds was not error.
Apply a Higher Standard of Review?
            A court may order involuntary termination only if the court finds that: (1) a parent has
committed a predicate act or omission harmful to the child, and (2) termination is in the best interest
of the child. Tex. Fam. Code Ann. § 161.001 (Vernon 2002). Any complaint that the evidence is
legally or factually insufficient to support the findings necessary for termination is analyzed by a
heightened standard of appellate review. See In re J.F.C., 96 S.W.3d 256, 266 (Tex. 2002); In re
C.H., 89 S.W.3d 17, 25 (Tex. 2002).
            Palmer contends federal constitutional due process principles require us to review de novo
the trial court's decision to terminate parental rights. We decline this invitation to depart from
established law setting forth the heightened standards of review applicable to termination of parental
rights.


 In reviewing the legal sufficiency of the evidence, we view all the evidence in a light most
favorable to the finding to determine whether a reasonable trier of fact could have formed a firm
belief or conviction that its finding was true. Tex. Fam. Code Ann. § 101.007 (Vernon 2002);
J.F.C., 96 S.W.3d at 266; C.H., 89 S.W.3d at 25. If, in light of the entire record, the disputed
evidence that could not reasonably have been credited in favor of the finding is so significant that
a trier of fact could not reasonably have formed a firm belief or conviction favoring the ruling, then
the evidence is factually insufficient. Id. The court reasoned this provides a standard that "focuses
on whether a reasonable jury could form a firm conviction or belief [yet] retains the deference an
appellate court must have for the factfinder's role." C.H., 89 S.W.3d at 26. We will apply these
established standards to the facts of Palmer's case as we address her remaining points of error
challenging the sufficiency of the evidence to sustain several of the trial court's findings.
Did Conditions or Surroundings Endanger the Children?
            Palmer contends the evidence is insufficient to establish by clear and convincing evidence
that she "knowingly placed or knowingly allowed children to remain in conditions or surroundings
which endanger the physical or emotional well-being of the child." Tex. Fam. Code Ann.
§ 161.001(1)(D). Under this section, we look to see if the environment itself poses a danger to the
child's physical or emotional well-being. In re S.H.A., 728 S.W.2d 73, 84 (Tex. App.—Dallas 1987,
writ ref'd n.r.e.). 
            It is beyond question that sexual abuse is conduct that endangers a child's physical or
emotional well-being. See In re R.G., 61 S.W.3d 661, 667 (Tex. App.—Waco 2001, no pet.); In re
King, 15 S.W.3d 272, 276 (Tex. App.—Texarkana 2000, pet. denied). Parental knowledge that an
actual offense has occurred is not necessary; it is sufficient that the parent was aware of the potential
for danger and disregarded that risk. R.G., 61 S.W.3d at 667–68; see In re Tidwell, 35 S.W.3d 115,
118 (Tex. App.—Texarkana 2000, no pet.). 
            The record reveals ample evidence that Palmer, at a minimum, knew of a risk for sexual
abuse and disregarded that risk. Although Palmer's account of what happened varied over time, she
admits believing "something" happened. By not following the required steps and using the State's
recommendations for dealing with the psychological impact of the behavior, Palmer indicates she
began to deny the allegations that A.B. and C.R. sexually abused their younger siblings. While she
did take the initiative to report the matter and have A.B. placed in detention, she then ceased taking
any steps toward ensuring the emotional well-being of the children, leaving unresolved any
psychological issues concerning sexual abuse. Palmer's denial and her attendant lack of support
could contribute to an environment in which the children could continue to be exposed to sexual
abuse and in which they could be hesitant to report the conduct. See R.G., 61 S.W.3d at 671. 
Additionally, the record contains evidence that Palmer did not keep C.R. away from the younger
children. Such a case would most certainly make for an environment which poses a danger to the
younger children's well-being. 
            The record demonstrates endangering conditions other than those relating to sexual abuse. 
Kidd testified that the Palmer house was "extremely messy," that there was no electricity in the
house, that the kitchen was "very dirty," and that there was "food laying [sic] around." Palmer's
history of drug and alcohol abuse lends itself to an unstable home environment and weighs in favor
of termination of her parental rights. See In re S.D., 980 S.W.2d 758, 763 (Tex. App.—San Antonio
1998, pet. denied). The record also reveals that on several occasions Palmer left the children in the
care of Edward Jarrells, who had, to her knowledge, recent convictions for possessing a controlled
substance and making terroristic threats. 
            Based on the foregoing evidence, we conclude the evidence was sufficiently clear and
convincing to support the trial court's finding. Looking at the evidence in a light most favorable to
the finding of the trial court, we conclude a reasonable trier of fact could have formed a firm
conviction that Palmer knowingly placed or allowed her children to remain in conditions or
surroundings that endangered their physical or emotional well-being. Also, the disputed evidence
on the matter is not so significant that the trial court could not have formed a firm conviction or
belief that its finding was true. We overrule Palmer's first and second points of error. 
Did Conduct Endanger the Children?
            Palmer also challenges the sufficiency of the evidence to support the trial court's finding that 
she engaged in conduct, or knowingly placed the children with persons who engaged in conduct,
which endangered the physical or emotional well-being of the children.


 Tex. Fam. Code Ann.
§ 161.001(E); Tex. Dep't of Human Servs. v. Boyd, 727 S.W.2d 531, 534 (Tex. 1987).
            Here, our inquiry, unlike that under Section 161.001(1)(D), focuses on conduct of either the
parent or the persons with whom the parent has placed the children. See In re P.S., 766 S.W.2d 833,
836 (Tex. App.—Houston [1st Dist.] 1989, no writ). Subsection (D) permits termination based on
a single act or omission, while subsection (E) requires a "course of conduct." R.G., 61 S.W.3d at
667. While the term "endanger" means more than a threat of metaphysical injury or the possible ill
effects of a less than ideal family environment, it is not necessary that the conduct be directed at the
child or that the child actually suffer injury. Boyd, 727 S.W.2d at 533. In our review, we look not
only at evidence regarding the parent's active conduct, but also evidence showing the parent's
omissions or failures to act. P.S., 766 S.W.2d at 835.
            Palmer's failure to participate in counseling shows her unwillingness or inability to ensure
the emotional well-being of the children following their experience with sexual abuse. This is but
one instance of conduct in her pattern of behavior which endangered the well-being of her children. 
Palmer's failure to follow through to seek help after the A.B. incident and her history with crack
cocaine and alcohol represent conduct that subjects the children to a life of uncertainty and
instability, thereby endangering their physical and emotional well-being. See S.D., 980 S.W.2d at
763. The evidence is legally and factually sufficient to support the finding that Palmer engaged in
conduct or knowingly placed the children with persons who engaged in conduct which endangered
the physical or emotional well-being of the children. We overrule Palmer's third and fourth points
of error.
Is Termination in the Children's Best Interests?
            Palmer argues that the evidence was legally and factually insufficient to support the trial
court's conclusion that termination of the parent-child relationship is in the best interests of the
children. The State, in addition to proving a predicate act or omission harmful to the child, must also
prove by clear and convincing evidence that termination is in the child's best interest. C.H., 89
S.W.3d at 23. 
            A number of factors have been considered by the courts in ascertaining the best interest of
the child. Included among these are the following: (1) the desires of the child, (2) the emotional and
physical needs of the child now and in the future, (3) the emotional and physical danger to the child
now and in the future, (4) the parental abilities of the individuals seeking custody, (5) the programs
available to assist these individuals to promote the best interest of the child, (6) the plans for the
child by these individuals or by the agency seeking custody, (7) the stability of the home or proposed
placement, (8) the acts or omissions of the parent which may indicate that the existing parent-child
relationship is not a proper one, and (9) any excuse for the acts or omissions of the parent. Holley
v. Adams, 544 S.W.2d 367, 371–72 (Tex. 1976).
            The record contains no evidence that the children desire to live with their mother. To the
contrary, C.R. appeared detached and showed no interest in even talking to Palmer. In an interview
at Longview Youth Shelter, C.R. even expressed to his psychologist his desire to stay at the shelter. 
C.R. has shown significant improvement in the more structured environment of a residential
treatment center. There is, however, evidence that the three youngest children are bonded to their
mother and have expressed affection for her. 
            The record also shows that Palmer has been unable to provide for the physical needs of the
children as demonstrated by the "extremely messy" house, the "very dirty" kitchen, the "food laying
[sic] around," and lack of electricity.


 Palmer's denial that sexual abuse occurred in her home and
her unexplained failure to undergo family counseling demonstrates a failure to care for the emotional
needs of the youngest children. Further, the State maintains that there are several good programs for
the children and that the children are good candidates for adoption into a stable home. 
            Palmer's failure to protect the emotional well-being of the children following the allegations
of sexual abuse, her failure to maintain a healthy, safe, and stable living environment, and her history
of drug and alcohol abuse indicate her relationship with her children is not good.
            Viewing the evidence in a light most favorable to the finding, we conclude there was
sufficient evidence to enable the trial court to form a firm belief that termination of Palmer's parental
rights was in the best interests of the four youngest children. While there is some evidence that
could be said to dispute that finding, that evidence is not so significant that the trial court could not
have maintained a firm belief favoring the ruling. The record contains clear and convincing evidence
of Holley factors


 supporting the conclusion that termination of Palmer's parental rights is in the best
interests of the children. We overrule Palmer's contentions to the contrary.
Conclusion
            Since the trial court rendered judgment within the time frame allowed by Section 263.401(a),
the trial court properly denied Palmer's motion to dismiss the cause. Rejecting Palmer's argument
that we should employ a de novo standard of review and adhering to the established standards
applicable to cases involving termination of parental rights, we hold clear and convincing evidence
supports the trial court's findings that Palmer allowed the children to remain in conditions which
endangered their physical and emotional well-being, that Palmer engaged in conduct, and placed the
children with persons who engaged in conduct, endangering the well-being of the children, and that
termination of Palmer's parental rights as to the four youngest children is in their best interests. 

            Accordingly, we affirm the trial court's judgment terminating Palmer's parental rights to these
four children.
 
                                                                                    Josh R. Morriss, III
                                                                                    Chief Justice

Date Submitted:         October 20, 2003
Date Decided:             December 31, 2003