ACCEPTED
03-14-00088-CR
4520679
THIRD COURT OF APPEALS
AUSTIN, TEXAS
3/16/2015 7:26:14 PM
JEFFREY D. KYLE
CLERK

**No. 03—14—00088—CR**
**No. 03—14—00408—CR**

IN THE TEXAS COURT OF APPEALS
THIRD DISTRICT
AT AUSTIN

FILED IN
3rd COURT OF APPEALS
AUSTIN, TEXAS
3/18/2015 12:01:14 PM
JEFFREY D. KYLE
Clerk

---

**DARIUS DONTAE LOVINGS v. THE STATE OF TEXAS**

Appeal from Cause Numbers D-1-DC—12—301231 and D-1-DC—12—203247
390th Judicial District Court, Austin, Travis County, Texas
Honorable Julie Kocurek, Judge Presiding

---

**APPELLANT'S BRIEF**

---

TO THE HONORABLE THIRD COURT OF APPEALS:

Comes now Appellant Darius Dontae Lovings, by and through his appointed counsel Paul M. Evans, and files this, his Appellant's Brief, in compliance with the Texas Rules of Appellate Procedure.

**APPELLANT HEREBY REQUESTS ORAL ARGUMENT.**

Respectfully submitted,

___/s/ Paul M. Evans_____

Paul M. Evans
Attorney for Appellant
811 Nueces Street
Austin, Texas 78701
(512) 569-1418
(512) 692-8002 FAX
paulmatthewevans@hotmail.com
SBN 24038885

1

## Identities of the Parties and Counsel

Presiding Judge:                                               Honorable Julie Kocurek

Appellant:                                                       Darius Dontae Lovings

Trial Counsel:                                         Jon T. Evans
806 W. 11th Street
Austin, Texas 78701

Paul M. Evans
811 Nueces Street
Austin, Texas 78701

Appellate Counsel:                           Paul M. Evans
811 Nueces Street
Austin, Texas 78701

Appellee:                                               State of Texas

Trial Counsel:                                         Steven Brand
Monica Flores
Christopher Baugh
Assistant District Attorneys
Travis County District Attorney
P.O. Box 1748
Austin, Texas 78767

Lead Appellate Counsel:                  Rosemary Lehmberg
District Attorney
c/o Appellate Division
Travis County District Attorney

# Table of Contents

Identity of Parties and Counsel     2

Table of Contents     3

Index of Authorities     4

Statement of the Case     7

Issues Presented     9

Statement of Facts     10

Summary of Arguments     32

Issue Number One—The trial court erred by admitting statements made in the course of a custodial interrogation after Appellant asserted his Fifth Amendment right to remain silent.     33

Issue Number Two—The trial court erred by finding that prior to custodial interrogation, Appellant voluntarily, intelligently, and knowingly waived his rights under *Miranda* and Tex. Code Crim.Proc. § 38.22.     52

Issue Number Three—The trial court erred by admitting speculative testimony about how an "innocent person" would respond to a custodial interrogation.     58

Issue Number Four—The trial court erred by admitting speculative opinion testimony about whether Appellant understood his *Miranda* rights.     60

Issue Number Five— The trial court erred by denying a special requested instruction in the jury charge on guilt-innocence.     61

Prayer     64

Certificate of Service     65

Certificate of Compliance                                                    66

**Index of Authorities**

Federal Constitution

Fifth Amendment……………………….3, 9-10, 22, 24-6, 28, 31, 33-4, 38-45,
                                                                47-8, 51-3, 55, 61-4

Fourteenth Amendment…………………………………………………...34

Federal Cases

*Anderson v. Terhune*, 516 F.3d 781 (9th Cir. 2008)………………………42-6

*Connecticut v. Barrett*, 479 U.S. 523 (1987)…………………….……45

*Berghuis v. Thompkins*, 560 U.S. 380 (2010)………………………34-5, 53-4

*Bruton v. United States*, 391 U.S. 123 (1968)…………………………..50

*North Carolina v. Butler*, 441 U.S. 369 (1979)………………….……...54

*Carter v. Kentucky*, 450 U.S. 288 (1981)…………………………………..63

*Cate v. Anderson*, 555 U.S. 818 (2008)…………………………..…….42

*Edwards v. Arizona*, 451 U.S. 477 (1981)………………………………46

*Fare v. Michael C.*, 442 U.S. 707 (1979)………………………...……..54

*Arizona v. Fulminante*, 499 U.S. 279 (1991)………………………...50

*Griffin v. California* 380 U.S. 609 (1965)………………………………....63

*Jackson v. Denno*, 378 U.S. 368 (1964)…………………...…….22

*Miranda v. Arizona*, 384 U.S. 436 (1966)………3, 9, 21, 23, 27, 32-7, 42-4, 46-7, 51-4, 57, 60-1

*Moran v. Burbine*, 475 U.S. 412 (1986)………………………………54, 56

*Michigan v. Mosley*, 423 U.S. 96 (1975)………………………35, 43, 45-7

*Quinn v. United States*, 349 U.S. 155 (1955)…………………………42

*Satterwhite v. Texas*, 486 U.S. 249 (1988)……………………...…..52

*Smith v. Illinois*, 469 U.S. 91 (1984)……………………………...…45-6

Texas State Statutes

Code of Criminal Procedure § 38.22…………………3, 9, 32, 34, 47, 52-3

Penal Code § 19.02………………………………………………..……7

Penal Code § 29.03………………………………………………..…7

Rule of Appellate Procedure § 21.8……………………………………8

Rule of Appellate Procedure § 44.2…………………….………48, 57, 59-61

Rule of Evidence § 602……………………………….………33, 59-60

Rule of Evidence § 701……………………………….………58-9

Texas Cases

*Almanza v. State*, 686 S.W.2d 157 (Tex.Crim.App. 1985)……………62-3

*Blue v. State*, 41 S.W.3d 129 (Tex.Crim.App. 2000)……………...……60

*Brooks v. State*, 132 S.W.3d 702 (Tex.App.—Dallas 2004, pet.ref'd)……………………………………………………………………52

*Brown v. State*, 92 S.W.3d 655 (Tex.App.—Dallas 2002), *aff'd* 122 S.W.3d 794 (Tex.Crim.App. 2003)……………………………....59

*Clay v. State*, 240 S.W.3d 895 (Tex.Crim.App. 2007)…………………48

*Cornet v. State*, 417 S.W.3d 446 (Tex.Crim.App. 2013)………………….62

*Dowthitt v. State*, 931 S.W.2d 244 (Tex.Crim.App. 1996)……………..…35

*Fairow v. State*, 943 S.W.2d 895 (Tex.Crim.App. 1997)……………58-9

*Garcia v. State*, 919 S.W.2d 370 (Tex.Crim.App. 1994)………....……..56

*Harris v. State*, 790 S.W.2d 568 (Tex.Crim.App. 1989)……………….48

*Jones v. State*, 944 S.W.2d 642 (Tex.Crim.App. 1996)………………….34

*Joseph v. State*, 309 S.W.3d 20 (Tex.Crim.App. 2010)……………..…53-7

*Lewis v. State*, 402 S.W.3d 852 (Tex.App.—Amarillo 2013), *aff'd* 428 S.W.3d 860 (Tex.Crim.App. 2014)……………………………59, 61

*Leza v. State*, 351 S.W.3d 344 (Tex.Crim.App. 2011)…………....36, 53-4

*Luna v. State*, 301 S.W.3d 322 (Tex.App—Waco 2009, no pet.)………35

*McDonald v. State*, 179 S.W.3d 571 (Tex.Crim.App. 2005)…………...36

*Maestas v. State*, 987 S.W.2d 59 (Tex.Crim.App. 1999)……………….47

*Marshall v. State*, 210 S.W.3d 618 (Tex.Crim.App. 2006)……………..35

*Montgomery v. State*, 810 S.W.2d 372 (Tex.Crim.App. 1990)………....36

*Ngo v. State*, 175 S.W.3d 738 (Tex.Crim.App. 2005)……………..…62

*Osbourn v. State*, 92 S.W.3d 531 (Tex.Crim.App. 2002)………………58

*Ramos v. State*, 245 S.W.3d 410 (Tex.Crim.App. 2008)……..…..34-6, 48

*Russell v. State*, 155 S.W.3d 176 (Tex.Crim.App. 2005)……………....59

*Vasquez v. State*, 919 S.W.2d 433 (Tex.Crim.App. 1996)…….…………62

*Watson v. State*, 762 S.W.2d 591 (Tex.Crim.App. 1988)…....….35, 46, 54

*Wesbrook v. State*, 29 S.W.3d 103 (Tex.Crim.App. 2000)……..…49, 52

*Williams v. State*, 257 S.W.3d 426 (Tex.App.—Austin 2008,
pet. ref'd)……………………………………………………35

## Statement of the Case

Appellant Darius Dontae Lovings was charged by indictment with the first degree felony offense of Murder, in cause D-1-DC-12-301231. Appellant was also charged with two counts of the first degree felony offense of Aggravated Robbery with a Deadly Weapon, in cause D-1-DC-12-203247. **CR1** 34; **(*CR1)** 28-9.[1] *See* Tex. Penal Code §§ 19.02(b)(1); 29.03(a)(2-3). At an initial arraignment, Appellant entered pleas of not guilty to both offenses. **RR3** 4-5. Thereafter, the trial court entertained contested pretrial hearings on issues common to both alleged offenses. **RR4** 4-8; **RR5** 4-25; **RR6** 6-70; **RR7** 4-26; **RR8** 4-8; **RR9** 4-6; **RR10** 4-19;

---

[1] A twenty-one volume Reporter's Record has been filed in trial court cause D-1-DC-12—301231 (Murder). A seven volume Reporter's Record has been filed in trial court cause D-1-DC-12-203247 (Aggravated Robbery). A single volume Clerk's Record has been filed in each cause. The present brief will almost exclusively refer to the record from the former cause. To avoid confusion, any references to the record from the latter cause will be distinguished by the use of an asterisk and parentheses [*e.g.*, "**RR2**" *versus* "**(*RR2)**," or "**CR1**" *versus* "**(*CR1)**."].

7

**(*RR3)** 4-14; **(*RR6)** 11-16; **CR1** 31-3, 126-8, 146-52; **(*CR1)** 12-14, 71-2, 78-80.

First, the State proceeded to trial on cause D-1-DC-12-301231. Trial was held before a jury. *See generally* **RR11** thru **RR21.** Appellant entered a plea of not guilty. **RR12** 21. The jury found Appellant guilty as alleged in the indictment. **RR16** 163-6; **CR1** 184, 198, 200-1. Appellant elected to have the jury assess punishment. **CR1** 167. The jury assessed a term of seventy-five (75) years in the Institutional Division of the Texas Department of Criminal Justice. The trial court sentenced Appellant accordingly. **RR18** 47-52; **CR1** 195, 198, 200-1. Appellant filed timely notice of appeal. **CR1** 203-4. Appellant also filed a Motion for New Trial, which was deemed denied by operation of law without a hearing. **CR1** 205-7. *See* Tex.R.App.Proc. § 21.8(a),(c). The matter was assigned cause number 03-14-00088-CR on appeal.

The parties later reached a plea bargain agreement on the remaining alleged offense of Aggravated Robbery. In exchange for a plea of guilty to Count I, Appellant was sentenced by the trial court to a term of twenty (20) years, to be served concurrently with the sentence previously assessed by the jury. The State waived Count II of the indictment. **(*RR6)** 4-16; **(*CR1)** 82-6, 92-4. Appellant filed timely notice of appeal. **(*RR6)** 11-16; **(*CR1)** 108. The trial court certified Appellant's right to appeal in both causes. **CR1** 210; **(*CR1)** 88. The cause was

assigned cause number 03-14-00408-CR on appeal. On Appellant's request, this Court ordered the appeals in 03-14-00088-CR and 03-14-00408-CR to be consolidated, for briefing and submission purposes only. This appeal followed.

## Issues Presented

**Issue Number One: The trial court erred by admitting statements obtained from Appellant in violation of his Fifth Amendment right to silence:** During custodial interrogation, Appellant invoked the right to remain silent at four different junctures with the phrase, "I plead the Fifth." Nonetheless, questioning continued, and Appellant made inculpatory statements. The trial court should have suppressed any statements made after the initial invocation of the right to remain silent. The judgment in each cause should be reversed and remanded for a new trial.

**Issue Number Two: The trial court erred by finding that prior to custodial interrogation, Appellant voluntarily, intelligently, and knowingly waived his rights under *Miranda* and Tex. Code Crim.Proc. § 38.22**: The State failed to establish by a preponderance of the evidence that Appellant made a voluntary, intelligent, and knowing waiver of his rights, whether express or implied. The trial court should have excluded Appellant's custodial interrogation from evidence. The judgment in each cause should be reversed and remanded for a new trial.

**Issue Number Three: The trial court erred by admitting speculative testimony about how an "innocent person" would act during a custodial interrogation:** Over objection by trial counsel, the lead detective was asked to describe how an "innocent person" would react to custodial interrogation. This called for pure speculation on his part. The trial court abused its discretion by admitting the evidence. The judgment in cause D-1-DC-12-301231 should be reversed and the cause remanded for a new trial.

**Issue Number Four: The trial court abused its discretion by admitting speculative opinion testimony about whether Appellant understood his *Miranda* rights:** Over objection by trial counsel, a psychologist testified that based upon her review of the recording of Appellant's custodial interrogation, she concluded that Appellant understood his *Miranda* rights. This called for pure speculation on her part. The trial court abused its discretion by admitting the

9

evidence. The judgment in cause D-1-DC-12-301231 should be reversed and the cause remanded for a new trial.

**Issue Number Five: The trial court erred by denying a special requested instruction in the jury charge on guilt-innocence:** Trial counsel requested an instruction be included in the jury charge on guilt-innocence, to the effect that Appellant's repeated invocations of "I plead the Fifth" should not be considered as evidence of his guilt. The trial court erred by refusing to grant the requested charge, causing some harm to the Appellant. The judgment in cause D-1-DC-12-301231 should be reversed and the cause remanded for a new trial.

## Statement of Facts

At almost midnight on June 26, 2012, Austin Police Officer Joshua Euhus was parked on San Antonio Street near the Travis County courthouse. Suddenly, a white Nissan Maxima passed in front of his car, stopped, and then reversed, ramming Euhus's patrol car. Euhus jumped out of his car and drew his firearm. After a brief pursuit, the man was subdued and handcuffed with the assistance of a Taser. Euhus identified this man in court as Appellant. Appellant gave Euhus his name and "said he had done a stick of PCP." Appellant seemed disoriented, so he was sent to the hospital for an evaluation. **RR13** 52-79; **RR19** SX #36-45. Officer Christopher Wille testified he was assigned to help guard Appellant while he was at the hospital. Later, Wille transported Appellant to the Travis County Jail, where he took possession of Appellant's clothing and personal effects. The clothing included black cargo shorts, red Nike tennis shoes, and a white muscle shirt. **RR13** 117-28; **RR19** SX #91-4.

Crime scene specialist Jeremiah Sullivan responded to the scene on San Antonio Street to document the collision and gather evidence. Sullivan took swabs from various components of the white Nissan Maxima for potential DNA evidence. Sullivan processed the front passenger door for fingerprints. On the the front passenger seat, Sullivan found a multi-colored, "Bob Marley" drawstring bag, containing a newspaper dated June 25, 2012, a red T-shirt with graphics on it, a .38 special revolver, and a Ruger 9mm semi-automatic pistol. At a later date, Sullivan processed the firearms and their components for potential DNA evidence. Sullivan was unable to lift any fingerprints from these items. The revolver contained five fired casings and one live unfired cartridge. **RR13** 82-116; **RR19** SX #46-70.

Around the same time as Appellant's arrest, Detective Jason Cumins was speaking to brothers Danny and Block'o Wilford—cousins to Appellant—at an interview room at the Austin Police homicide unit. They came forward to share information after seeing a press release earlier that evening. **RR14** 139-43. During the daytime on June 24, Danny saw Appellant in the parking lot of Appellant's grandmother's house, where he stayed. Appellant, who "seemed a little stressed," was wearing shorts and a red shirt. The next day, as Danny watched the news, he saw a description of an individual and a purple Honda Accord. Danny called Block'o and told him he needed to find Appellant and speak to him. Later that day,

11

the Wilfords went to the police department to give statements. **RR12** 243-66; *see also* **RR15** 59-65 (testimony of Appellant's grandmother, Susan Smith).

Also on June 24, Appellant had called Block'o Wilford and asked him to pay a visit. At around 6:45 or 7:00 PM, Block'o drove his purple 1997 Honda Accord to meet him. Appellant wore a white tank top shirt, dark cargo shorts, and Nike shoes. He had a red shirt thrown over his shoulder. According to Block'o, Appellant "seemed a little distraught" and "a little disturbed." Appellant had Block'o drive him to a friend's house. When Appellant wanted another ride elsewhere, Block'o told him he could not continue driving him around. Asking if he could borrow the car, Appellant said he needed it for about forty-five minutes. Block'o reluctantly lent the car at around 8:00 PM. Block'o also lent Appellant his phone in case he needed to contact him. Eventually, as Block'o realized Appellant had not returned with the car, he began calling the phone repeatedly. After speaking with his brother Danny and to Appellant's grandmother about the missing car, Block'o got a call from Appellant, close to 10:45 or 11:00 PM. Appellant assured him the car was fine and that he was on the way to return it. Appellant finally returned the car at about 12:45 PM, and Block'o drove him back to his grandmother's house. **RR13** 7-31, 39-44, 47-8; **RR19** SX #29-35.

The following afternoon, when Danny called Block'o, Block'o learned that police were looking for a car matching the description of his Accord. Block'o

12

contacted a friend, Detective Lawrence Davis, who confirmed that police were looking for a purple Accord dating from 1997 to 2000. Danny and Block'o then went to police headquarters to give statements. Block'o told them about his Accord and what had happened with his cousin Appellant the night before, while Danny described Appellant's appearance for the officers. **RR13** 32-8, 46-7.

Around 11:00 PM on June 24, while mechanic Jonathan Verzi was driving on Sprinkle Cutoff Road, he saw a set of headlights flashing at him from the side of the road. Verzi pulled over. A man approached his window, said "he was having car problems." As Verzi removed his seat belt, the man took a step back. Verzi testified he heard a click. When Verzi turned around, "there is a gun in my face." Verzi described the gun as "Glock style," "mostly black" with a "silver barrel." Verzi assumed the click came from the trigger being pulled. Verzi put his car into gear and sped off. Pulling over at a dance studio down the street, Verzi called 911. There, two officers met with Verzi. The next day, Verzi gave officers a sworn written statement. Verzi described the man as a black male in his late 20's or early 30's, about 5'5" to 5'9" and between 160 and 190 pounds, wearing dark shorts and a red shirt with graphics on it, and driving a purple, four-door, late 90's model Honda Accord. Verzi also went with detectives to show them where the incident occured. Verzi was not able to pick anyone out of a sequential or "double-blind" photo lineup conducted by Detective Robert Holsonback. **RR12** 32-60, 228-42.

Dr. Charles Weaver, a cognitive psychologist and professor of psychology and neuroscience at Baylor University, testified as an expert witness for the State on the topic of eyewitness identification. Weaver had been asked to evaluate Verzi's statements and his failure to make an identification. Weaver explained the significance of a "double-blind" or sequential lineup, as opposed to the outdated method of the "six-pack" lineup. Weaver discussed variables that may have affected Verzi's ability to identify a suspect. Weaver testified he was not surprised that Verzi did not pick a suspect out of the lineup. Generally speaking, Weaver opined that "[e]yewitness identification is just much harder than most people think it is." **RR16** 53-77.

Austin Police Officer Randy DeLuna and another officer met Verzi at around 11:20 PM on June 24. Verzi "appeared to be real nervous." Their six-minute videotaped conversation was introduced into evidence. Ten minutes later, DeLuna drove down the stretch of Sprinkle Cutoff Road that Verzi described. DeLuna saw nothing out of the ordinary. DeLuna later responded to a crash on the same road that involved a deceased person. **RR12** 61-82; **RR19** SX #2.

Close to midnight on the same night, Eric Tharps was returning home to Austin from a trip with his wife and kids. On Sprinkle Cutoff Road, they saw a dark Mustang "that was on the side of the road up against a fence post," in a way that "kind of looked questionable." The lights were on and the engine was running.

14

Tharps's wife called 911. As Tharps approached the car, he saw "a gentleman slumped over to the right" and "lots of blood." The man was unresponsive. The driver's window was down. Tharps described what he saw to his wife, who relayed the information to the 911 operator. Tharps detected a burning smell. He did not try to turn the car off due to the amount of blood. Tharps waited for police and firemen to arrive. **RR12** 82-98. Austin firefighter Jeremy Copus testified he responded to the scene. The driver was unresponsive, with no pulse. Copus described the unsuccessful efforts to revive the man. Copus was not able to remove the keys, which led him to believe the car was not in park. Copus felt that the amount of blood he saw was not commensurate with the relatively light amount of damage to the car. Copus noticed a potential gunshot wound on man's left temple. **RR12** 98-109.

Steve Martinez was the first Austin Police officer to arrive at the crash. EMS and firefighters were already present. They had extracted the driver from the car, and they informed Officer Martinez "that he didn't make it." Martinez notified the vehicular homicide unit and secured the scene. Martinez began to survey the area and take photos, following the path where the car had left the roadway. Martinez saw that the car had gone in reverse the whole way. The amount of blood Martinez saw did not make sense to him. There was only slight damage suffered by the vehicle, and the blood spatter pattern inside the vehicle was not consistent with

a crash. While photographing the deceased, Martinez noticed what appeared to be a bullet hole in his cheek. Martinez did not see an exit wound. The homicide unit was notified. Martinez found a Department of Public Safety ID card on the body, bearing the name William Ervin. Detectives began to arrive at the scene. Rachel Ervin, the wife of the deceased, also showed up. Martinez spoke with her and later transported her to headquarters. There, Martinez spoke to lead Detective Jason Cumins and described what he saw at the scene. **RR12** 110-50; **RR19** SX #3-16.

Rachel Ervin last heard from her husband William about 11:00 PM on June 24, when he called to ask if she needed anything. Both worked at the Department of Public Safety headquarters in Austin. Rachel grew concerned when William had not arrived home by 12:30 AM. She called his workplace, and a co-worker told her William had left at the normal time. Rachel went looking for William and came across the crime scene at Sprinkle Cutoff Road. **RR16** 101-7; **RR19** SX #1.

Detective Anthony Nelson was assigned to assist Cumins in the investigation of Ervin's death. Nelson reported to the scene, where he directed crime scene specialists and assisted in processing potential evidence. Nelson observed the body. He concluded the injury close to the left ear was consistent with a gunshot wound, apparently at close range due to the presence of nearby tattooing or stippling. Nelson did not see an exit wound. Once the sun rose, Nelson was able

16

to discern the skid marks. Nelson estimated the car had gone about fifty feet in reverse before coming to a stop. When Nelson learned of the other report from earlier that evening—*i.e.*, the call regarding the attempted shooting of Verzi, less than a mile further north on Sprinkle Cutoff Road—the crime scene was expanded accordingly. Nelson described the survey of the area and potential evidence that was found. Crime scene specialist Juanita Vasquez took photographs, while her supervisor Charles Dean made a video recording. Medical examiner personnel arrived to begin their forensic analysis and transport the body to their office for an autopsy. Nelson testified that Texas Rangers arrived to lend assistance to the investigation, and Nelson and a Ranger were able to survey the scene from overhead in a DPS helicopter. Detective Cumins also arrived on scene, accompanied by Jonathan Verzi. **RR12** 151-84, 187-212, 214-17, 225-7; **RR13** 131-61; **RR19** SX #17-27, 107-70.

Detective Nelson testified the victim's Ford Mustang was impounded and transported to a secure facility for evidentiary processing—*e.g.*, photographs, DNA swabbing, and searching for potential fingerprint evidence—on June 26. A purple Honda Accord was also processed for potential evidence at that time, with the assistance of crime scene specialist Stacey Boatright. **RR12** 184-6, 212-14. Boatright photographed and helped process the Mustang and the Accord. The exterior driver's door handle of the Mustang was swabbed for DNA, and a black

17

IPhone was found inside the car. Boatright processed the exterior door for latent prints, but none were found. Boatright saw "reddish brown stains throughout" the inside of the car. As for the Accord, Boatright gathered swabs from a number of components inside the car. She gathered seven latent print lift cards from the driver's side. Boatright also took photographs of Appellant at the jail on June 26, at the request of Detective Cumins. **RR14** 94-123; **RR19** SX #192-215.

Pursuant to a search warrant, Detective Rory Sullivan collected a buccal swab from Appellant for the purposes of DNA testing and analysis. **RR13** 197-201; **RR19** SX #216. Using William Ervin's blood sample and Appellant's buccal swabs as the basis for comparisons, Austin Police senior DNA analyst Elizabeth Morris tested a variety of materials. In sum, Morris did not match Appellant's DNA to any of the evidentiary items she analyzed. **RR14** 23-69; **RR19** SX #85-90, 164, 166, 169-70, 175, 211-13, 216. Morris's colleague Clair McKenna tested swabs taken from the revolver and the Ruger pistol that were recovered from the white Nissan. McKenna found a profile with a mixture of DNA on a swab taken from the grips of the revolver. Whereas McKenna could not exclude Appellant as a contributor to this profile, she also could not definitively state that Appellant was a contributor. McKenna testified that "the probability of selecting an unrelated person at random who could be a contributor to this profile is approximately * * * 1 in 57 for blacks." **RR14** 67-8, 70-94.

Austin Police latent print examiner Sharon Cook could not find any identifiable latent prints on lift cards taken from a cellphone and cellphone case found in the Ford Mustang. Cook did find four identifiable prints on lift cards taken from the exterior driver's window of the Honda Accord, as well as a palm print taken from the rear driver's side window, but none matched the known fingerprints of Appellant or William Ervin. **RR13** 202-23; **RR19** SX #214-15. Cook's colleague Toby Cross examined latent prints found on the exterior of the white Nissan Maxima. The prints did not match the known fingerprints of Appellant. **RR14** 14-22; **RR19** SX #84.

Dr. Satish Chundru performed an autopsy on William Ervin on June 25. On the left side of Ervin's face, Chundru observed a fatal gunshot wound surrounded by "stippling," caused by flakes of gunpowder. Chundru testified the presence of stippling indicated the gunshot was from close range, "[a]nywhere from two inches to two feet." The bullet traveled from "left to right, front to back, and then downwards." Chundru retrieved the bullet and submitted it for evidence. **RR16** 78-100; **RR19** SX #224-32. Crime scene specialist Jennifer Mezei attended the autopsy and took photographs. Mezei also collected the decedent's clothing, personal effects, a sample of his blood standard, swabs for gunshot residue, and the projectile recovered from his neck. **RR13** 162-73; **RR19** SX #171-7.

Greg Karim, a firearm and tool mark examiner for Austin Police, analyzed the 9mm Ruger and the .38 Special revolver and ammunition found in the white Nissan, as well as the projectile recovered from Ervin's neck at his autopsy. By examining bullets fired from the revolver and comparing them to the projectile recovered at Ervin's autopsy, Karim concluded they were fired from the same gun. **RR15** 47-58, 65-91; **RR16** 6-27; **RR19** SX #72, 75, 163, 168, 176, 233-312. The Ruger 9mm bore a serial number of 307-44442. The State introduced business records from McBride's Guns, indicating a Ruger 9mm with the same serial number was sold to a Jimmy Brown on February 22, 2010. *See* **RR15** 70-1; **RR16** 100, 108-9; **RR19** SX #240, 313.

At trial, Sergeant Jason Cumins testified that early in the morning hours of June 25, he was assigned as the lead detective in the Ervin homicide. Cumins reported to the homicide unit office and began to communicate with colleagues already at the scene, including Detective Anthony Nelson. Cumins gathered more information from officers as they returned to the office, and he interviewed Rachel Ervin. Cumins then visited the scene at Sprinkle Cutoff Road, where he surveyed the area and spoke to Nelson. Cumins returned to the office when he learned about the other incident involving Verzi. Cumins had other officers pick Verzi up and bring him to the office to be interviewed at around 8:00 AM on June 25. They spoke for over an hour and a half before going out to Sprinkle Cutoff Road, so that

Verzi could point out where it happened. Cumins drove Verzi home before returning to the office. Based on the information Cumins and his colleagues had gathered so far, a press release was issued later that day, seeking information and relaying a particular description. **RR14** 126-40; **RR15** 19-20.

Cumins interviewed Block'o and Danny Wilford after they came forward in response to the press release. The Wilfords were cooperative, and they provided Cumins with Appellant's name. Block'o allowed officers to process his car and cell phone for potential evidence. Right as their conversation ended at around midnight on June 25, Cumins learned Appellant had just been arrested for the episode on San Antonio Street. Cumins also learned there was a bag containing two handguns found inside the car Appellant was driving. Patrol officers brought Appellant to Cumins's office for an interview. Because he felt he was intoxicated, Cumins decided not to interview Appellant at that time, but he did have photographs taken of him. Cumins identified Appellant in court. **RR14** 139-53; **RR15** 20-1, 23-4; **RR19** SX #184-5, 187, 217-221.

After allowing a period of approximately eleven hours to pass, Cumins and Texas Ranger Gary Phillips picked Appellant up from the jail to interview him at the homicide office. Cumins informed Appellant of his *Miranda* rights before the interview began. It lasted approximately six hours. At the tail end of the interview, detectives from the robbery unit also participated and asked questions

21

about the theft of the car Appellant used to drive downtown prior to his arrest. The recording of the interview was introduced at guilt-innocence at Appellant's murder trial, subject to redactions that had been ruled upon prior to trial. **RR14** 154-72; **RR15** 10-46; **RR19** SX #223; **RR21** CX #9-10,[2] CX #12 (= transcript of redacted statement); *see also* **RR10** 5-19; **RR11** 7-8, 180-6; **RR12** 7-9, 267; **RR13** 232-3; **RR14** 123; **RR21** CX #2 (= transcript of statement without redactions).

Prior to the trial of either cause, trial counsel had sought by written motion to suppress the custodial interview of Appellant. **RR4** 4-8; **RR5** 4-5; **RR21** CX #1-2; **CR1** 31-3; **(*CR1)** 12-14. The trial court held a *Jackson v. Denno* hearing to determine if Appellant's statements were admissible. *See Jackson v. Denno*, 378 U.S. 368 (1964). Cumins testified at this pretrial hearing. **RR5** 10-24; **RR6** 6-35. Ranger Phillips also testified at the hearing, although he did not later testify at trial. **RR6** 35-52. At the close of the hearing, trial counsel argued the statement should be suppressed in its entirety, because Appellant had not knowingly, intelligently, and voluntarily waived his rights. In the alternative, trial counsel argued the remainder of the interrogation should have been suppressed once Appellant asserted his Fifth Amendment right to silence. **RR6** 54-63. The trial court denied the motion to suppress Appellant's statement and entered written findings of fact

---

[2] The Court intended to have an email regarding redactions to Appellant's statements marked and included in the record as CX #10, while a State's Proffer of Evidence was intended to be marked as CX #9. The numbers were switched and erroneously marked on the exhibits themselves. **RR12** 7; **RR21** CX #9-10.

and conclusions of law accordingly. **RR9** 4; **RR10** 5; **CR1** 146-52. Trial counsel timely renewed his objections at appropriate moments over the course of the trial. **RR14** 165, 171 (guilt-innocence phase); **RR17** 10, 179 (punishment phase).

The portions of the custodial interrogation that were introduced at guilt-innocence may be summarized as follows. *See* **RR19** SX #223. Before the interview began, Cumins read the *Miranda* rights aloud to Appellant from a standard blue card. Appellant did not expressly waive his rights. Cumins started by asking Appellant basic information about who he was, where he lived, and what sort of family he had. *See* **RR21** CX #12 at pp. 3-9.[3] First, Appellant said he did not know why he was there or why he had been arrested. Then, Appellant said it was for "reckless driving." *Id*. at 9-16. As Cumins tried to pinpoint what Appellant had done the day before, Appellant remembered leaving his grandmother's house around the time when it became dark. Appellant had visited friends, and he recalled being in the area of Martin Luther King Boulevard and Springdale Road, but he was vague on details. *Id*. at 14-25.

Appellant then described backing into a police car and getting Tased at the time of his arrest. **RR21** CX #12 at pp. 25-6, 29-32. Appellant discussed ongoing difficulties with his grandmother and having a place to stay. He mentioned he had

---

[3] The recording itself should be consulted for the accuracy of the contents thereof. It was admitted as evidence, whereas the transcript was not. However, for ease of reference, and as a matter of convenience, the present Brief will refer to page numbers in the same transcript provided as an aid to the jury. *See* **RR14** 165-71; **RR19** SX #223; **RR21** CX #12.

worn the same clothes for "days now." *Id*. at 32-8, 58, 62-3. Appellant then abruptly asked Cumins and Phillips, "You guys hear that?" Appellant told them he was hearing "[v]oices" and described how he had been on antidepressants. *Id*. at 39-44. Appellant added that "[t]he voices told [him] to do * * * all kind of crazy stuff." *Id*. at 47-9. When asked why he had crashed into the patrol car near the jail, Appellant said he was "[t]rying to get some help." *Id*. at 54-5.

Appellant acknowledged there were two guns in the bag found in the car. Appellant said he feared for his life because of the voices. He said the voices led him to wreck the car downtown. Appellant borrowed he guns, but he could not remember who lent them to him. At first he could not remember how long he had them. Then, he said he borrowed them the day before. Appellant could not recall what kind of guns they were. **RR21** CX #12 at pp. 55-66. Eventually, Appellant offered the name of Jimmy Brown, Jr., as the friend who may have lent him the guns. *Id*. at 66-9. At one point, Appellant asked, "The voices got me tripping yesterday, right?" *Id*. at 69-70.

Appellant continued to maintain he had the guns since the prior evening. As Phillips tried to pin down the circumstances of his visit to Jimmy Brown, Jr.'s house, Appellant stated, "I plead the Fifth." Cumins asked, "When you say you plead the Fifth, you mean you just don't want to answer that question? Is that what you're saying?" Appellant replied, "That damn right." Appellant was again asked

24

if the guns were stolen before Cumins and Phillips left the room for a break. **RR21** CX #12 at pp. 71-4. When Cumins and Phillips returned, they resumed questioning Appellant about his whereabouts and activities in the days leading up to his arrest. *Id*. at 74-96. As they tried to pinpoint when Appellant returned to his grandmother's house the night before, Appellant again twice stated, "I plead the Fifth." *Id*. at 95-6. The questioning continued without pause. Appellant acknowledged he knew where he was. Appellant was asked if he borrowed "anybody's car this weekend," and he described how he had borrowed a Honda Accord from his cousin "Blanco" [*sic*][4] in order to use it to get some clothes. Cumins told Appellant they had already spoken to "Blanco." Appellant acknowledged he also borrowed "Blanco's" phone. *Id*. at 96-104.

Appellant could not recall where he went in "Blanco's" car, other than visiting a woman named Ashley. Appellant denied having the guns or his bag with him at the time. **RR21** CX #12 at pp. 104-6. Eventually, Cumins mentioned that someone fitting Appellant's description, in a car matching the description of his cousin's car, had "scared the hell out of [a] kid" on Sprinkle Cutoff Road. At first, Appellant denied involvement. *Id*. at 106-11. Appellant then relented, saying that he was "[j]ust trying to scare him." Appellant got him to stop when he "[j]ust flagged him down." Initially, Appellant denied he had a gun at the time. Then, he said it was unloaded. Cumins tried to pinpoint when Appellant had unloaded the

---

[4] From the context, "Blanco" clearly refers to Appellant's cousin, Block'o Wilford.

25

guns. Again, Appellant stated, "I plead the Fifth." Without pause, Cumins continued to ask why Appellant had scared the man. *Id*. at 111-19.

Appellant could not recall when he returned "Blanco's" car to him, but he remembered that "Blanco" gave him a ride back to his grandmother's house. Appellant denied trying to flag anyone else down that night. When told that someone had been shot on the same road, Appellant denied being involved. **RR21** CX #12 at pp. at 119-27. Eventually, Appellant said his "life was on the line," because of "[t]he voices." Appellant said he "had to do it or I was going to die." Appellant said the voices told him to "[f]ind a victim." Appellant said the first man was still alive because "[t]here weren't no bullets in the gun." *Id*. at 128-36. Cumins and Phillips pressed Appellant for details, but he did not directly reply to their questions. Appellant did mention he "was on PCP." When asked if he regretted "taking that man's life," Appellant answered, "Fuck yeah, I regret it and this shit ain't right. My life was on the line, man." *Id*. at 136-41. Appellant was asked how he flagged the man down. Eventually, after another digression about hearing the "voices," Appellant said he flagged him down by flashing his headlights at him. *Id*. at 141-56. When asked if he had used the semiautomatic or the revolver, Appellant said he used the "black revolver" because he "had to," because he "thought I was going to die." When asked what happened after he shot the man, Appellant said "[t]he car went back in reverse" into the woods, and he

26

left. Upon request, Appellant demonstrated with body language how the car reversed into the woods. Appellant maintained there were no bullets in the gun when he flagged down "that first kid." *Id*. at 156-72.

Psychologist Marisa Mauro,[5] Ph.D., testified as an expert for the State. Mauro reviewed Appellant's recorded interview, related offense reports, and Appellant's medical records from Shoal Creek Hospital prior to trial. Over objection as to speculation, Mauro gave the opinion that Appellant understood his *Miranda* rights, based on her review of the interview. With reference to portions of the interview where Appellant claimed to be hearing "voices," Mauro testified that in her opinion, there were no signs that Appellant "was having auditory hallucinations or hearing voices." Instead, Mauro saw "many indications to the contrary," which she described. Mauro testified Appellant had been admitted to Shoal Creek in March 2012 because he was "experiencing symptoms consistent with PCP-induced psychosis." **RR16** 30-47. The medical records from Shoal Creek were also introduced into evidence, subject to agreed redactions concerning matters apart from PCP abuse. **RR16** 27-30, 108-110, 113, 131-5; **RR19** SX #316; *see also* **RR10** 7-9; **RR11** 180-2; **RR12** 259-65; **RR13** 48-50, 64-5, 78.

During the charge conference, trial counsel requested an instruction that if the jury were to find that Appellant's statement was given freely and voluntarily,

---

[5] The Reporter's Records refer to Dr. Mauro as "Melissa," but her correct given name is "Marisa." *Cf.* "Additional Notice of State's Expert Witnesses," **CR1** 78.

27

they were not to consider his statements of "I plead the Fifth" as evidence against him. The trial court denied the request. **RR15** 92-5; **RR16** 122-4; **RR21** CX #14. At guilt-innocence, Appellant chose not to testify. Apart from brief testimony by Appellant's grandmother Susan Smith, the defense did not introduce evidence. **RR15** 59-65; **RR16** 111-13, 139-40. After hearing the argument of counsel, the jury retired to deliberate. Appellant was found guilty. **RR16** 140-67.

At the punishment phase, the State introduced testimony regarding the events immediately preceding Appellant's arrest, including the theft of a car from Elizabeth Pantoja.[6] Tammy Robinson testified that a little after 11:00 PM on June 25, 2012, she and her husband were at a gas station near the intersection of MLK and Springdale Road when she heard "[m]aybe three" gunshots. Robinson looked and saw a man approaching cars. Robinson identified the man in court as Appellant. Robinson testified he went to a black truck and tried to get in, but the driver panicked and hit a white car in front of him. Appellant then went to the white car, made the passengers get out, and drove away in the car. Robinson did not see a gun in Appellant's hands. **RR17** 31-6, 49-59.

Elizabeth Pantoja testified that on June 25, 2012, a little after 11:00 PM, she was a passenger in a white Nissan Maxima stopped at a light at MLK and Springdale Road. Suddenly, the car was hit from behind. A black male got in the

---

[6] This constituted the underlying offense of Aggravated Robbery in cause D-1-DC-12-203247. *See* **(*CR1)** 28-9.

car on the passenger side and told Pantoja and her boyfriend, the driver, to get out. The man took a "U-turn" and drove off in the direction of Interstate 35. The man had a bag that "was like Jamaican color," or "green and yellow and red." **RR17** 37-48; **RR19** SX #36, 40-2, 47-8. Detective Christopher Leleux showed Pantoja a sequential lineup on June 26, but she was unable to pick out Appellant. Leleux also retrieved a surveillance video from the gas station that was introduced into evidence. **RR17** 80-101; **RR20** SX #339-40.

Austin Police Officer Nicolas Draper reported to the scene after receiving a "shots fired call"—later updated as a "robbery urgent"—at 11:21 PM. Draper met with Pantoja and her boyfriend, Jesus Martinez Delgado, and learned their four-door white car had been stolen. Pantoja told officers what had happened. Officers also spoke to her boyfriend, as well as to Robinson and her husband. Draper transported Pantoja and her boyfriend to headquarters to speak to detectives. In the meantime, Draper learned that Appellant had crashed Pantoja's car into Officer Euhus's patrol unit. Draper helped Officer Wille take Appellant to the Travis County Jail. Draper recalled that about an hour or two before the theft of the car, he had seen Appellant walking in the roadway, carrying a "Rastafarian" or "Jamaican" backpack. Draper asked him to move onto the sidewalk, and he did. **RR17** 59-79; **RR20** SX #338.

The State called Sergeant Roger Dean with the Travis County District Attorney's Office to testify regarding records from Appellant's various prior convictions, which Dean was able to identify as Appellant's by way of fingerprint comparison. **RR17** 102-12, 141-58; **RR20** SX #325, 327-37.

Dr. Mauro returned to testify at the punishment phase. In addition to consulting Appellant's Shoal Creek records and his criminal history, Mauro had reviewed Appellant's medical records from the Travis County Jail, which were also introduced into evidence. Mauro found indications in the jail records that Appellant had been malingering in terms of purporting to hear voices. **RR17** 22-6; **RR20** SX #326. Essentially, Mauro gave an opinion that there was no available treatment for someone "exhibiting all of th[e] traits" that she found to be associated with Appellant. **RR17** 162-77.

Detective Cumins also testified at the punishment phase. The State admitted the portions of Appellant's statement that had been redacted during the guilt-innocence phase, *i.e.* those portions that covered the events leading up to Appellant crashing the white Nissan into Officer Euhus's patrol unit. Trial counsel renewed his prior objections to Appellant's statement. **RR17** 177-90; **RR20** SX #342; **RR21** CX #2. Sergeant Tom Eaton with the Travis County District Attorney's Office testified that he obtained a telephone call made by Appellant from jail on July 28, 2012, which was then introduced into evidence. **RR17** 190-6;

**RR20** SX #343. The State rested its case on punishment after the jury heard the testimony of Ishon Rison, older brother of the deceased, and of Rachel Ervin, who had also testified at guilt-innocence. **RR17** 197-213.

The defense introduced testimony from Latrice Wilson, Appellant's cousin; Luciana Lovings, Appellant's wife; and Sonfa Lovings, his mother. **RR17** 214-28; **RR18** 7-22. Appellant chose not to testify in his own behalf. **RR18** 5-7. After hearing argument of counsel and retiring to deliberate, the jury returned a verdict and assessed a term of seventy-five (75) years in the Institutional Division. The trial court sentenced Appellant accordingly. **RR17** 25-52; **CR1** 195, 198, 200-1.

The State then proceeded on the remaining offense of Aggravated Robbery in cause D-1-DC-12-203247. An effort to try the case before a jury ended in a mistrial after the trial court sustained a *Batson* challenge lodged by the defense. **(*RR2)** 4-9; **(*RR3)** 4-14; **(*RR4)** 4-170; **(*RR5)** 4-21. Ultimately, the parties entered into a plea bargain agreement. In exchange for a plea of guilty to Count I, Appellant was sentenced by the trial court to a term of twenty (20) years, to be served concurrently with the sentence previously assessed by the jury. The State waived Count II of the indictment. **(*RR6)** 4-16; **(*CR1)** 82-6, 92-4. Appellant filed timely notice of appeal and reserved the right to appeal any Fifth Amendment issues raised by written motion prior to trial. All applicable rulings from the other cause were carried over to the Aggravated Robbery cause. **(*RR3)** 4-14; **(*RR6)**

31

11-16; **(\*CR1)** 108. The trial court certified Appellant's right to appeal in both causes. **CR1** 210; **(\*CR1)** 88. This appeal followed.

## Summary of Arguments

The trial court erred by overruling trial counsel's motion to suppress and admitting statements made by Appellant after he invoked the right to remain silent. Appellant's invocation of the right to remain silent was unequivocal, unambiguous, and unqualified. The trial court abused its discretion by finding to the contrary. Any statements made by Appellant after the invocation of the right to remain silent should have been suppressed. Additionally, Appellant made no express waiver of his rights under *Miranda* and Tex. Code Crim.Proc. § 38.22. The State failed to establish by a preponderance of the evidence that there was an implied waiver of his rights that was voluntary, intelligent, and knowing. Appellant believes *de novo* review of the custodial interrogation will confirm his position that there was no waiver of rights, and that the trial court erred by admitting his custodial interrogation into evidence. The nature of these errors is such that reversal is required in both causes pending on appeal.

The remaining issues affect only the judgment of conviction for Murder in trial court cause D-1-DC-12-301231. The trial court erred by admitting testimony from Detective Cumins on how an "innocent person" would act in response to custodial interrogation. In a similar vein, the trial court erred by admitting the

32

conclusion of Dr. Mauro that Appellant understood his *Miranda* rights. The testimony in question amounted to pure speculation, in violation of Tex. Rule Evid. § 602, and the error was injurious to Appellant's substantial rights. The trial court also erred by refusing to grant a requested instruction in the jury charge on guilt-innocence which would have admonished the jury not to consider Appellant's invocations of "I plead the Fifth" as evidence of guilt. The error caused some harm to Appellant, and he is entitled to a new trial in trial court cause D-1-DC-12-301231.

### Issue Number One
**The trial court erred by denying the motion to suppress statements made by Appellant after he invoked his Fifth Amendment right to remain silent.**

On four separate occasions during the course of the videotaped recording of the custodial interrogation of Appellant, he responded to questioning by stating the words, "I plead the Fifth." Yet, the interrogation continued. Thereafter, Appellant made inculpatory statements. Trial counsel urged the suppression of any statements made after Appellant had initially invoked the right to remain silent. **RR6** 55-59, 62. The trial court abused its discretion by overruling trial counsel's motion to suppress and by admitting the portions of the interview that followed Appellant's invocation of his right to remain silent. The judgment of conviction in each cause should be reversed and remanded for a new trial.

The Fifth Amendment to the United States Constitution provides that no person "shall be compelled in any criminal case to be a witness against himself." This guarantee was made applicable to the states by the Due Process Clause of the Fourteenth Amendment. *Ramos v. State*, 245 S.W.3d 410, 418 (Tex.Crim.App. 2008). Consistent with this right to remain silent, law enforcement officials, before questioning a person in custody, must inform him that he has a right to remain silent and that any statement he makes may be used against him in court. *Berghuis v. Thompkins*, 560 U.S. 380-1, 387-8 (2010); *Miranda v. Arizona*, 384 U.S. 436, 444-5, 478-9 (1966). Article 38.22 of the Texas Code of Criminal Procedure codifies the holding of *Miranda* and sets out rules governing the admissibility of an accused's written and oral statements. *See* Tex. Code Crim.Proc. § 38.22; *Jones v. State*, 944 S.W.2d 642, 650 n.11 (Tex.Crim.App. 1996).

The right to remain silent requires the police to immediately cease custodial interrogation when a suspect "indicates in any manner, at any time, prior to or during questioning, that he wishes to remain silent." *Ramos*, 245 S.W.3d at 418, *quoting Miranda*, 384 U.S. at 473-4. The suspect does not need to use any particular word or phrase to invoke the right to remain silent. Any declaration of a desire to terminate the contact or inquiry should suffice. No magic words are required. *Ramos*, 245 S.W.3d at 418. The suspect need not object to further questioning in order to protect the right to remain silent. *Watson v. State*, 762

34

S.W.3d 591, 599 (Tex.Crim.App. 1988). A failure to stop questioning after the suspect unequivocally invokes his right to remain silent violates his constitutional rights and renders any subsequently obtained statements inadmissible. *Berghuis*, 560 U.S. at 381-2; *Dowthitt v. State*, 931 S.W.2d 244, 257 (Tex.Crim.App. 1996). The exercise of the right to remain silent must be "scrupulously honored." *Miranda*, 384 U.S. at 479; *Michigan v. Mosley*, 423 U.S. 96, 104 (1975); *Ramos*, 245 S.W.3d at 418.

Granted, when the invocation of right to remain silent is ambiguous, an officer can either continue questioning "regarding the offense" or stop questioning and clarify whether suspect wanted to remain silent. *Marshall v. State*, 210 S.W.3d 618, 628 (Tex.Crim.App. 2006); *Dowthitt*, 931 S.W.2d at 257. Ambiguity exists when the suspect's statement is subject to more than one reasonable interpretation under the circumstances. *Luna v. State*, 301 S.W.3d 322, 325 (Tex.App.—Waco 2009, no pet.); *see also Dowthitt*, 931 S.W.2d at 257. In determining whether the right to remain silent was unambiguously invoked, courts look to the totality of the circumstances. *Watson*, 762 S.W.2d at 597; *Luna*, 301 S.W.3d at 325; *Williams v. State*, 257 S.W.3d 426, 433 (Tex.App.—Austin 2008, pet. ref'd).

A trial court's ruling at a suppression hearing is reviewed for an abuse of discretion, and it will be upheld so long as the ruling is reasonably supported by the record—*i.e.*, within the zone of reasonable disagreement—and is correct under

any theory of law applicable to the case. *Ramos*, 245 S.W.3d at 417-18;

*Montgomery v. State*, 810 S.W.2d 372, 391 (Tex.Crim.App. 1990) (op. on reh'g).

The trial court's ruling with respect to alleged *Miranda* violations should be

analyzed under the totality of the circumstances, with deference to the trial court

on questions of historical fact and credibility, but with a review *de novo* on all

questions of law and mixed questions of law and fact that do not turn on credibility

determinations. *Leza v. State*, 351 S.W.3d 344, 349 (Tex.Crim.App. 2011). The

test for abuse of discretion is whether the trial court acted arbitrarily or

unreasonably, without reference to any guiding rules or principles. *Montgomery*,

810 S.W.2d at 380. A trial court abuses its discretion only when its decision "is so

clearly wrong as to lie outside that zone within which reasonable persons might

disagree." *McDonald v. State*, 179 S.W.3d 571, 576 (Tex.Crim.App. 2005).

The following summary of Appellant's custodial interrogation is adopted

without modification from the trial court's "Findings of Fact," aside from omitting

the internal enumeration of items therein. Appellant does not take issue with the

accuracy of the trial court's findings of fact as reproduced below, other than to add

select supplementation as noted, and with references to the transcript[7] for the sake

of convenience:

---

[7] The undersigned counsel is mindful of the fact that the transcript was not admitted as evidence. Only the video recording itself was admitted. At any rate, whether one consults the transcript or the recording itself, the end result of the present analysis is the same. **RR 19** SX #223; **RR21** CX #1-2, CX #12.

At 12:15 p.m. Detective Cumins read aloud to Darius Lovings the Standard Miranda Warnings.

The following exchange occurred:

Detective Cumins: "All right, were going to start talking to you, Darius, just going to go ahead and proceed. I need to read you these Miranda rights. Have you ever heard them before, the little blue card? All right, just bear with me. I know it's redundant. You have the right to remain silent, not make any statement at all and that any statements you make may be used against you and probably will be used against you at your trial. Any statement you make may be used as evidence against you in court. You have the right to have a lawyer present to advise you prior to and during any questioning. If you're unable to employ a lawyer, you have the right to have a lawyer appointed to advise you prior to and during any questioning."

Defendant responded: "Uh-huh."

Detective Cumins: "You have the right to terminate this interview at any time. Do you understand all those?"

Defendant responded: "Uh-huh."

Detective Cumins responded: "All right, good." [*See* **RR21** CX #2 at p. 5]

After the above exchange, Detective Cumins and Ranger Phillips proceeded to question the defendant for approximately 1 hour and 25 minutes. [*See* **RR21** CX #2 at pp. 5-73]

The defendant did not expressly waive his Miranda rights.

After about an hour and 20 minutes, Detective Cumins asked if the defendant wanted to "keep talking," to which the defendant responded, "Keep talking." [*See* **RR21** CX #2 at p. 70]

At 1:39 p.m.- 1:40 p.m. the following exchange occurs:

Ranger Phillips: "Do you remember how you got over there? Were you driving or did somebody else drive you over there to Jimmy's

house, Jimmy Jr.'s? Maybe that would help you remember whether it was during the week or the weekend."

Defendant: "I plead the fifth."

Detective Cumins: "When you say you plead the fifth, you mean you just don't want to answer that question? Is that what you're saying?"

Defendant: "That damn right."

Detective Cumins: "Okay. You got any questions for us?"

Defendant: "No."

Detective Cumins: "Okay. You don't wonder like what your charges are or how long you're going to be here or anything like that?"

Defendant: "What's my charges?" [*See* **RR21** CX #2 at pp. 72-3]

*See* **CR1** 146-7. The trial court's "Findings of Fact" omits the rest of the exchange,

which continued as follows:

> DETECTIVE CUMINS: Well, I'm trying to talk to you and I was ready to explain everything to you, but you're not really talking to us. Right now you're in charge—you're being charged for taking that car.
>
> APPELLANT: Right.
>
> DETECTIVE CUMINS: So—and I think you already knew that.
>
> APPELLANT: Uh-huh.
>
> DETECTIVE CUMINS: But the reason we're asking about weapons is, you know, are they stolen? That's a different charge. We just need to know did you steal them from somewhere?
>
> APELLANT: No.
>
> DETECTIVE CUMINS: Okay.

RANGER PHILLIPS: Okay.

DETECTIVE CUMINS: All right. We'll give you a few minutes, all right? Drink some water, take a break. We'll come back in in just a minute.

Cumins and Phillips then left the room. *See* **RR21** CX #2 at pp. 73-4. The trial

court's "Findings of Fact" resumes as follows:

At 1:40 the detectives took a 20 minute lunch and/or water break and resumed questioning of the defendant at 1:57 and continued for another hour and 20 minutes. [*See* **RR21** CX #2 at pp. 74-147]

At 2:21 p.m.-2:22p.m. the following exchange occurs:

Detective Cumins: "So at what point did you go back to your grandmother's? You told me earlier like 1:30 in the morning you go back to your grandmother's house? Is that right, you stayed at your grandmother's Sunday night?"

Defendant: "I plead the fifth."

Detective Cumins: "Okay. Can you tell me anything else you did on Sunday, so anybody can say you were with them, anybody can verify where you were?"

Defendant: "I plead the fifth."

Detective Cumins: "All right. Do you know where you're at now?"

Defendant: "Uh-huh."

Detective Cumins: "Where are you?"

Defendant: "Seventh Street." [*See* **RR21** CX #2 at pp. 95-6]

*See* **CR1** 147-8. The trial court's "Findings of Fact" again omits the rest of the

related exchange, which continued as follows:

> DETECTIVE CUMINS: That's right. Police department. Did you borrow anybody's car this weekend?
>
> APPELLANT: Yeah, I had my cousin's car.
>
> DETECTIVE CUMINS: What's your cousin's name?
>
> APPELLANT: Let me think. Blanco.

*See* **RR21** CX #2 at p. 96. Cumins and Phillips proceeded to question Appellant about his cousin "Blanco," borrowing his cousin's Honda Accord, and Appellant's whereabouts and activities while he was driving the Accord. **RR21** CX #2 at pp. 96-119.

The trial court's "Findings of Fact" resumes as follows:

> At approximately 2:51 p.m. the following exchange occurred:
>
> Detective Cumins: "... So my question is, when did you take the bullets out of the gun to scare this kid, if the gun was unloaded? Before you left in Blanco's car or after you were on that country road?"
>
> Defendant: "I plead the fifth."
>
> Detective Cumins: "Okay. That's fine. So you can tell me why you scared him, what made you decide to scare this kid? Were you frustrated? Had you been arguing with your grandmother again? Because Blanco was mad at you for having his car so long you got frustrated?"
>
> Defendant: "Just going through it."
>
> Detective Cumins: "Just going through it? Just upset? Okay. So after this kid rolled off scared to death, where did you go then? Do you remember where you went?'"

Defendant: "'To Walnut Creek." [*See* **RR21** CX #2 at pp. 118-9]

**CR1** 148. The trial court's "Conclusions of Law" recites the following with respect to the decision to overrule Appellant's motion to suppress on Fifth Amendment grounds:

> [T]he Court finds that the defendant's responses that he "plead the fifth" to four different questions by the officers and throughout the interview was not an unambiguous and unequivocal invocation of his right to remain silent. The basis of this finding includes but is not limited to the following evidence:
>
> (a) When the officers asked a question that the defendant did not want to answer, the defendant stated, "I plead the fifth." Detective Cumins immediately attempted to clarify as to whether the defendant did not want to answer that particular question, to which Lovings answered, "Damn right." Detective Cumins asked the defendant a different question, to which the defendant answered and continued his interaction without any indication that he wanted to remain silent. Mr. Lovings' conduct indicates a willingness to answer some questions while reserving his right to not answer others. The right not to answer one question exists just as the right not to answer any questions at all.
>
> (b) Before and after the defendant asserted that he "Plead the fifth," he continued to answer without any resistance or concern many questions posed by the officers. The Court finds that these assertions by the defendant were question specific and none of them were an unambiguous invocation of his right to remain silent. The phrase "plead the fifth" has also entered common vernacular and used today to mean that a person does not want to answer a question because it will put him in a bad light.

**CR1** 151. *See also* **RR15** 122-3.

"Surely, in popular parlance and even in legal literature, the term 'Fifth Amendment' in the context of our time is commonly regarded as being

synonymous with the privilege against self-incrimination." Such was the observation of the United States Supreme Court sixty years ago. The same holds no less true today. *See Quinn v. United States*, 349 U.S. 155, 163 (1955), *cited by Anderson v. Terhune*, 516 F.3d 781, 783 (9th Cir. 2008), *cert. denied sub nom. Cate v. Anderson*, 555 U.S. 818 (2008). "It is likely that few Americans can profess fluency in the Bill of Rights, but the Fifth Amendment is surely an exception. From television shows like 'Law & Order' to movies such as 'Guys and Dolls,' we are steeped in a culture that knows a person in custody has 'the right to remain silent.' *Miranda* is practically a household word. And surely, when a criminal defendant says, 'I plead the Fifth,' it doesn't take a trained linguist, a Ph.D., or a lawyer to know what he means." *Anderson*, 516 F.3d at 783.

"It is rare for the courts to see such a pristine invocation of the Fifth Amendment" as, "I plead the Fifth." *Anderson*, 516 F.3d at 784. If one were to assume *arguendo* that there is some ambiguity inherent in this particular invocation, the clarifying phrase "[t]hat damn right" tends to resolve the issue. Granted, the phrase "I plead the Fifth" could be intended as a generalized, blanket invocation of the right to remain silent. Or, with or without elaboration, the phrase could be intended to address a specific question or line of inquiry. Either way, the phrase serves to unambiguously invoke the right to remain silent. Appellant did not

say, *e.g.*, "Maybe I will plead the Fifth." Appellant did not ask, *e.g.*, "Do you think I should perhaps plead the Fifth?"

Nor did Appellant ever qualify his invocations as being specific to the particular question being asked. That qualification was based solely on assumptions made by Detective Cumins. "Using 'context' to transform an unambiguous invocation into open-ended ambiguity defies both common sense and established Supreme Court law. It is not that context is unimportant, but it simply cannot be manufactured by straining to raise a question regarding the intended scope of a facially unambiguous invocation of the right to silence. * * * Nothing was ambiguous about the statement 'I plead the Fifth.' * * * 'I plead the Fifth' left no room for doubt. * * * 'Taking the Fifth' is as unequivocal as one can get in invoking the right to remain silent." *Anderson*, 516 F.3d at 787-8.

"If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease. At this point, he has shown that he intends to exercise his Fifth Amendment privilege; any statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise." *Miranda*, 384 U.S. at 473-4; *Mosley*, 423 U.S. at 103. Apparently, Cumins and Phillips were not aware of these essential *Miranda* requirements. *See* the testimony of Detective Cumins: "If he says he pleads the Fifth, I respect that, and I change the question." **RR6** 27; *see also* **RR15**

43

15-18, "Pleading the Fifth simply means they don't want to answer that question;" *also see* the testimony of Ranger Phillips: "I have no training that specifically tells me to stop questioning someone when they plead the Fifth." **RR6** 43.

After Appellant first uttered the phrase, "I plead the Fifth," Detective Cumins arguably "clarified that he just didn't want to answer that one question." However, Cumins made no effort to clarify whether Appellant wished to decline the questions that followed. Cumins himself admitted he made no such effort, "[n]ot at that point." **RR6** 24; *see also* testimony of Ranger Phillips, **RR5** 47-8. Cumins then asked Appellant, "You got any questions for us?" Appellant gave another unambiguous, unequivocal reply: "No." Yet, the questioning continued. *See* **RR5** 22; **RR21** CX #2 at pp. 72-3. The trial court concluded that "Detective Cumins immediately attempted to clarify as to whether the defendant did not want to answer that particular question." This was an unreasonable determination of the facts, insofar as the purported "clarification" was meaningless in terms of addressing whether or not Appellant intended his invocation as a general wish to end all questioning and not just the specific question at hand. *Cf. Anderson*, 516 F.3d at 789-90.

"Interpretation is only required where the defendant's words, understood as ordinary people would understand them, are ambiguous." *Connecticut v. Barrett*, 479 U.S. 523, 529 (1987). "When the initial request to stop the

questioning is clear, 'the police may not create ambiguity in a defendant's desire by continuing to question him or her about it." *Anderson*, 516 F.3d at 790, *quoting Barrett*, 479 U.S. at 535 n. 5 (Brennan, J., concurring). "By parsing [Appellant's] invocation into specific subjects, 'the police failed to honor a decision of a person in custody to cut off questioning, either by refusing to discontinue the interrogation upon request or by persisting in repeated efforts to wear down his resistance and make him change his mind.'" *Anderson*, 516 F.3d at 790, *quoting Mosley*, 423 U.S. at 105-6. "The net result is that such follow-up questions allowed the officer to avoid honoring the Fifth Amendment and, as in a right to counsel situation, enabled 'the authorities through 'badger[ing]' or 'overreaching'—explicit or subtle, deliberate or unintentional—[to] wear down the accused and persuade him to incriminate himself.'" *Anderson*, 516 F.3d at 790, *quoting Smith v. Illinois*, 469 U.S. 91, 98 (1984).

The trial court's "Conclusions of Law" relies on the fact that after Appellant elected to "plead the Fifth, "he continued to answer without any resistance or concern many questions posed by the officers." **CR1** 151. "[U]nder the clear logical force of settled precedent, an accused's *postrequest* responses to further interrogation may not be used to cast retrospective doubt on the clarity of the initial request itself." *Anderson*, 516 F.3d at 791, *quoting Smith*, 469 U.S. at 100 (emphasis in original). "Invocation and waiver are entirely distinct inquiries, and

the two must not be blurred by merging them together. * * * With respect to the waiver inquiry, we accordingly have emphasized that a valid waiver 'cannot be established by showing only that [the accused] responded to further police-initiated custodial interrogation.'" *Smith*, 469 U.S. at 98, *quoting Edwards v. Arizona,* 451 U.S. at 484. "Using an accused's subsequent responses to cast doubt on the adequacy of the initial request *itself* is even more intolerable. No authority, and no logic, permits the interrogator to proceed . . . on his own terms and as if the defendant had requested nothing, in the hope that the defendant might be induced to say something casting retrospective doubt on his initial statement." *Smith*, 469 U.S. at 98-9 (internal quotation omitted, emphasis in original); *Anderson*, 516 F.3d at 791. It is immaterial that Appellant did not voice further objection when his invocation of the right to remain silence was afforded no deference. *Watson*, 762 S.W.3d at 599.

"[T]he admissibility of statements obtained after the person in custody has decided to remain silent depends under *Miranda* on whether his 'right to cut off questioning' was 'scrupulously honored.'" *Mosley*, 423 U.S. at 104. The factors relevant to the *Mosley* analysis are (1) whether the suspect was informed of his right to remain silent before the initial questioning; (2) whether the suspect was informed of his right to remain silent before the subsequent questioning; (3) the length of time between initial questioning and subsequent questioning; (4) whether

the subsequent questioning focused on a different crime; and (5) whether police scrupulously honored the suspect's initial invocation of the right to remain silent. This analysis will hinge upon the unique facts and circumstances of each case. *Maestas v. State*, 987 S.W.2d 59, 62-3 (Tex.Crim.App. 1999). With regards to the five *Mosley* factors, only the first weighs in favor of the State: prior to any questioning, Appellant was initially warned of his right to remain silent, along with his other rights under *Miranda* and Tex. Code Crim.Proc. § 38.22. Incidentally, Appellant was not asked to waive his rights, nor did he make any express waiver of those rights. **RR5** 19-21; **RR6** 16-19, 34-5; **RR21** CX #2 at p. 5.

As for the remaining *Mosley* factors, Appellant was not again informed of his right to remain silent at any of the four instances when he stated, "I plead the Fifth." The length of time between initial questioning and subsequent questioning after each waiver was negligible. Upon the first utterance of "I plead the Fifth," there was limited questioning that followed before Cumins and Phillips left the room for almost twenty minutes. On their return, questioning promptly resumed without any additional warnings regarding Appellant's rights. In the other three instances, questioning continued without any delay or pause whatsoever, with the focus still on the same offense. **RR21** CX #2 at pp. 72-3, 95-6, 118-19. Clearly, there was little in the way of any sort of honoring of Appellant's repeated invocations. To borrow a phrase from Cumins, no amount of "Monday morning

quarterbacking the transcript" can change the fact that Appellant's Fifth Amendment right to remain silent was violated, and any statements made after his unambiguous, unequivocal, and unqualified invocation of that right were inadmissible. *See* **RR6** 26.

Admission of evidence in violation of the Fifth Amendment right to remain silent is subject to harm analysis under Tex.R.App.Proc. § 44.2(a). *Ramos*, 245 S.W.3d at 419. Factors to be considered include: the source and nature of the error; the importance of the evidence to the State's case, as well as the emphasis placed upon the evidence by the State; whether the evidence was cumulative of other evidence; the presence or absence of other evidence corroborating or contradicting the evidence on material points; the overall strength of the State's case; whether finding the error harmless would encourage the State to repeat the conduct; and any other factor, as revealed by the record, that may shed light on the probable impact of the error on the mind of the average juror. *Clay v. State*, 240 S.W.3d 895, 904 (Tex.Crim.App. 2007); *Harris v. State*, 790 S.W.2d 568, 587 (Tex.Crim.App. 1989).

In gauging whether the error is harmless in the context of the totality of the State's evidence, "[a]n appellate court should not focus on the propriety of the outcome of the trial. Instead, the appellate court should calculate as much as possible the probable impact of the error on the jury in light of the existence of

other evidence. While the most significant concern must be the error and its effects, the presence of overwhelming evidence supporting the finding in question can be a factor in the evaluation of harmless error. If an appellate court rules that an error is harmless, it is in essence asserting that the nature of the error is such that it could not have affected the jury. Stated in an interrogatory context, a reviewing court asks if there was a reasonable possibility that the error, either alone or in context, moved the jury from a state of nonpersuasion to one of persuasion as to the issue in question." *Wesbrook v. State*, 29 S.W.3d 103, 119 (Tex.Crim.App. 2000) (citations omitted).

Turning to the instant cause, "[a] confession is like no other evidence. Indeed, 'the defendant's own confession is probably the most probative and damaging evidence that can be admitted against him. * * * [T]he admissions of a defendant come from the actor himself, the most knowledgeable and unimpeachable source of information about his past conduct. Certainly, confessions have profound impact on the jury, so much so that we may justifiably doubt its ability to put them out of mind even if told to do so." *Arizona v. Fulminante*, 499 U.S. 279, 296 (1991), *quoting Bruton v. United States*, 391 U.S. 123, 139-40 (1968) (White, J., dissenting). In the portions of the interview that followed Appellant's invocation of the right to remain silent, Appellant made a number of inculpatory statements: he discussed borrowing his cousin's car; he

admitted participating in the Verzi incident and gave corroborating details; and he admitted to the murder, again with corroborating details. *See* **RR21** CX #2 at pp. 72-190.

The State heavily relied upon and emphasized Appellant's inadmissible statements during closing argument. During initial closing remarks, the State noted that Appellant said he left Sprinkle Cutoff Road after the Verzi incident, which explained why officers investigating the Verzi report did not see Appellant when they checked. **RR16** 142. The State also discussed how Appellant's inadmissible statements corroborated Verzi's testimony, and more importantly, how his statements were consistent with the manner and means of the complainant's death. **RR16** 144-5. During further closing remarks after trial counsel's argument, the State continued to discuss Appellant's inadmissible statements. The jury was invited to re-examine the recording and parse Appellant's replies to questioning. During argument, the State even published a snippet of the recording where, in response to questioning after the invocation of the right to remain silent, Appellant demonstrated through his body language "how that car went through the woods in reverse." The State suggested that Appellant's explanation constituted the most damning piece of evidence of all of Appellant's guilt. **RR16** 154-60; **RR19** SX #223; *see* **RR21** CX #12 at pp. 163-4.

There were apparently no witnesses to the homicide. There was no surveillance footage of the incident. There was no fingerprint evidence tying Appellant to the instant offenses. **RR13** 202-23; **RR14** 14-22. Verzi could not identify Appellant. **RR12** 43, 51. Pantoja could not identify Appellant. **RR17** 46, 83-6, 90. There was DNA evidence linking Appellant to one firearm, but it was far from conclusive. **RR14** 23-94. Appellant's statements were not cumulative of other evidence adduced at trial. Without Appellant's recorded statement, the evidence in support of his guilt was far from overwhelming.

There is a great risk that finding the error harmless would encourage the State to repeat such conduct in the future. Both Detective Cumins and Ranger Phillips demonstrated an acute lack of awareness of basic *Miranda* protocol with respect to the invocation of the right to remain silent. **RR6** 27, 43; **RR15** 15-18. A week prior to trial, Cumins sent a text message to Assistant District Attorney Steven Brand, the lead prosecutor at trial, asking if he "needed to know some more about [the Fifth Amendment] or a tutorial on the Fifth Amendment." **RR15** 33-4. During closing remarks, on one hand, the State seemingly tried to downplay the importance of the phrase, "I plead the Fifth," by noting that the Fifth Amendment is not explicitly mentioned in the recital of *Miranda* rights. On the other hand, the State suggested that the invocation of "I plead the Fifth" was but one of many

51

indicators that Appellant was "in control" of the interrogation, not the officers conducting the questioning. **RR16** 155.

Harm analysis in the present context is not a simple matter of judging whether there was sufficient evidence—absent the erroneously admitted statements —for a rational juror to declare guilt. *Satterwhite v. Texas*, 486 U.S. 249, 258-9 (1988); *Brooks v. State*, 132 S.W.3d 702, 708 (Tex.App.—Dallas 2004, pet.ref'd). The question is whether the erroneously admitted evidence could have affected the jury's decision. *Wesbrook*, 29 S.W.3d at 119. It cannot be said beyond reasonable doubt that these erroneously admitted statements, in Appellant's own words, did not contribute to his conviction in each cause. The judgment of the trial court in each cause should be reversed and remanded for a new trial.

## Issue Number Two
**The trial court erred by denying the motion to suppress statements made by Appellant because the State failed to establish he made a knowing, intelligent, and voluntary waiver of his *Miranda* rights pursuant to Tex. Code Crim.Proc. § 38.22.**

Trial counsel also urged the suppression of Appellant's statements on the basis that he had not knowingly, intelligently, and voluntarily waived his rights under *Miranda* and Tex. Code Crim.Proc. § 38.22. **RR6** 54-5, 58-9, 62. The trial court abused its discretion by overruling trial counsel's motion to suppress and by finding that Appellant made an implied waiver of his rights. The judgment of conviction in each cause should be reversed and remanded for a new trial.

52

In its "Findings of Fact," the trial court acknowledged that Appellant "did not expressly waive his Miranda rights." The trial court's "Conclusions of Law" further recites the following with respect to the waiver of rights:

> Based upon the totality of the circumstances of the interview and relevant evidence presented in the live hearing, this Court finds that the Defendant impliedly waived his Miranda rights. These circumstances include but are not limited to the demeanor of the defendant throughout the video, the response of "uh-huh" by the Defendant indicating that he heard/understood his rights, the Defendant's willingness to answer questions by the officers, his interaction with the officers throughout the interview, his sometimes pausing thoughtfulness and reflection before answering some questions, his assertion that he wanted to "keep talking," his statement that he "Plead the fifth," that was an hour and twenty minutes into his questioning and his subsequent "pleading the fifth" to specific questions that he chose not to answer. All of these factors show that the defendant clearly understood the consequences of answering questions posed by the officer and thus establishes an implied waiver of his rights.

**CR1** 151.

The State bears the burden of establishing a knowing, intelligent, and voluntary waiver of one's rights under *Miranda* and Tex. Code Crim.Proc. § 38.22. *Leza*, 351 S.W.3d at 349, 351; *Joseph v. State*, 309 S.W.3d 20, 24 (Tex.Crim.App. 2010). Waiver must be proven by a preponderance of the evidence. *Leza*, 351 S.W.3d at 349, 351; *Joseph*, 309 S.W.3d at 24. A waiver can be expressly made or implied by the accused's conduct. *Berghuis*, 560 U.S. at 383; *Joseph*, 309 S.W.3d at 24. An implied waiver of one's rights is established upon a showing that the accused: (1) was given the proper warnings; (2) understood the warnings and their

53

consequences; and (3) made an uncoerced statement. *Berghuis*, 560 U.S. at 381-4; *see Moran v. Burbine*, 475 U.S. 412, 422-3 (1986); *Leza*, 351 S.W.3d at 349.

"[T]he general rule is that neither a written nor an oral express waiver is required." However, a waiver cannot be presumed from an accused's silence or the fact that a confession was made after warnings were provided, *Watson*, 762 S.W.2d at 601. The determination of whether there was a valid waiver of rights involves and analysis of the totality of the circumstances, "including the background, experience, and conduct of the accused." *North Carolina v. Butler*, 441 U.S. 369, 374-5 (1979); *Leza*, 351 S.W.3d at 349, 352-3; *Joseph*, 309 S.W.3d at 25. "First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice, rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the 'totality of the circumstances surrounding the interrogation' reveals both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived." *Moran*, 475 U.S. at 421, *quoting Fare v. Michael C.*, 442 U.S. 707, 725 (1979); *Joseph*, 309 S.W.3d at 25.

In the instant cause, Appellant cannot point to any intimidation, coercion, or deception on the part of the officers. But if "voluntariness" amounts to willing

participation, as *Joseph* seems to suggest, such is not to found on the recording in evidence. *See Joseph*, 309 S.W.3d at 25-6; **RR19** SX #223; **RR21** CX#1. As argued above in Issue Number One, Appellant did try to terminate the interview by stating, unequivocally and unambiguously, on four occasions, "I plead the Fifth." **RR21** CX #2 at pp. 72-3, 95-6, 118-19. *Cf. Joseph*, 309 S.W.3d at 26: "[A]t no time did [Appellant] ask that the interview be stopped." An examination of the recording itself does not reflect that Appellant willingly participated in the conversation. Appellant's answers to questions were generally vague and evasive. At no point does Appellant seem "eager to share information." *Cf. Joseph*, 309 S.W.3d at 26. Appellant appears distracted and disinterested throughout the recording, even when he is not purporting to hear "voices." **RR19** SX #223; **RR21** CX#1.

Over the course of the interview, Cumins made several offers to "help" Appellant, including promises to steer him into mental health assistance, *e.g.* "We can try to get you some medical help and to see some doctors and things like that for sure." There was also the repeated implication that Appellant would receive this help only if he continued to answer questions truthfully. **RR21** CX#2 at pp. 32, 41, 46-8, 53-5, 59-60, 69, 107-8, 118, 123-4, 128, 138, 143-4, 146-7, 152, 157-8, 160. "A promise made by a law enforcement officer may render a confession involuntary if it was positive, made or sanctioned by someone with apparent

55

authority, was of some benefit to the defendant and was of such a character as would likely cause a person to speak untruthfully." *Garcia v. State*, 919 S.W.2d 370, 388 (Tex.Crim.App. 1994) (op. on reh'g), *cited by Joseph*, 309 S.W.3d at 26 n. 8. Cumins's promises were of such a character, especially since Cumins made the overwhelming majority of these promises of help subsequent to Appellant's initial complaints about hearing voices. **RR21** CX#2 at p. 39.

A greater issue is presented by the question of whether or not Appellant's alleged "implied waiver" reflected the "requisite level of comprehension," such that would demonstrate "full awareness of both the nature of the rights being abandoned and the consequences of the decision to abandon them." *Moran*, 475 U.S. at 421; *Joseph*, 309 S.W.3d at 27. Appellant was never asked to waive his rights, nor did he make any express waiver of rights. **RR5** 19-21; **RR6** 16-19, 34-5; **RR21** CX #2 at p.5. The trial court's determination that Appellant understood his rights rests on the thin basis of two utterances of the phrase, "uh-huh," spoken by Appellant in response to Cumins's recital of the applicable rights. **CR1** 151; *see* **RR19** SX #223; **R21** CX #1, CX #2 at p.5. Over the course of approximately five minutes following this exchange, Cumins developed enough concern over Appellant "[s]eem[ing] kind of sleepy" that he insisted on getting him some coffee: "That will wake you up so you're coherent." During this intervening period of five minutes, it is important to note that the questions directed at Appellant were of

56

little consequence to the instant alleged offenses. A review of the recording itself calls into question the extent of Appellant's actual awareness and comprehension of his rights. **RR19** SX #223; **R21** CX #1, CX #2 at pp.5-12. There were no subsequent warnings given to Appellant after he arguably regained his coherence with the help of coffee, and it was after this juncture that the interrogation began to turn to more pertinent matters. Additionally, there is nothing in the record to support the argument that Appellant was aware of the consequences of waiving his rights.

In *Joseph*, the defendant went so far as to sign his name on a standard *Miranda* card enumerating his rights. 309 S.W.3d at 22. Yet, four members of the Court of Criminal Appeals joined the majority opinion only after noting that the totality of the circumstances presented a "very close case" in terms of whether the record supported a valid implied waiver of rights. *Joseph*, 309 S.W.3d at 30 (Cochran, J., concurring, joined by Price, Johnson, and Holcomb, J.J,.). In the instant cause, the State failed to meet its burden by a preponderance of the evidence. The trial court abused its discretion by overruling Appellant's motion to suppress and by admitting his statements into evidence. The error was not harmless pursuant to Tex.R.App.Proc. § 44.2(a), for the same essential reasons advanced with regards to Issue Number One, *above*. The judgment of the trial court in each cause should be reversed and remanded for a new trial.

**The trial court erred by admitting testimony about how an "innocent person" would act during a custodial interrogation.**

During his testimony on redirect examination, while on the topic of false confessions, Cumins responded affirmatively when asked, "Are there certain ways you think from your training and experience you would expect somebody to act if they are being accused of a particular crime that they didn't do?" The State then asked, "What would that be that you are looking out for?" Trial counsel objected, on the basis that this was "speculative," as well as on the basis that Cumins was "not an expert of any type in the area." The trial court overruled the objection. Cumins answered, "We're taught that someone that's innocent is going to argue up one side and down the other nonstop and demand that they are innocent. That wasn't the case in this interview." **RR15** 41-3. The trial court abused its discretion by allowing this testimony.

Tex. Rule Evid. § 701 "allows witnesses to give opinion or inference testimony provided that the opinion is rationally based on perception of the witness and helpful to a clear understanding of the witness's testimony or the determination of a fact in issue." *Fairow v. State*, 943 S.W.2d 895, 897 (Tex.Crim.App. 1997); *Osbourn v. State*, 92 S.W.3d 531, 539 (Tex.Crim.App. 2002). Tex. Rule Evid. § 602 provides that a witness may not testify to a matter unless "evidence is introduced sufficient to support a finding that he has personal

knowledge of the matter." "The perception requirement of Rule 701 is consistent with the personal knowledge requirement of Rule 602. It requires the proponent of lay-opinion testimony to establish that the witness has personal knowledge of the events upon which his opinion is based." *Fairow*, 943 S.W.2d at 897-8, 898 nn.6-7. An opinion is rationally based upon perception if a reasonable person could draw the opinion based upon personal knowledge or experience. *Fairow*, 943 S.W.2d at 899-900.

The testimony in question failed to satisfy the personal knowledge requirement as well as the perception requirement for admissibility under Rules §§ 602 and 701. Cumins's opinion on the matter amounted to "nothing more than pure speculation on his part" and should have been excluded. *Lewis v. State*, 402 S.W.3d 852, 865 (Tex.App.—Amarillo 2013), *aff'd* 428 S.W.3d 860 (Tex.Crim.App. 2014). The trial court abused its discretion by admitting the testimony. Error in the admission of testimony of this nature is non-constitutional error subject to review under Tex. R.App.Proc. § 44.2(b). *Russell v. State*, 155 S.W.3d 176, 181 (Tex.Crim.App. 2005). Pursuant to rule 44.2(b), any non-constitutional error that does not affect appellant's substantial rights must be disregarded. The presumption of innocence is clearly a substantial right. *Brown v. State*, 92 S.W.3d 655, 662-3 (Tex.App.—Dallas 2002), *aff'd* 122 S.W.3d 794 (Tex.Crim.App. 2003), *citing Blue v. State*, 41 S.W.3d 129, 131 (Tex.Crim.App.

2000). The record provides no assurance that this testimony did not influence the jury, or that the testimony in question had only a slight effect, and that Appellant would have been convicted without this testimony. The judgment of conviction for the offense of Murder in cause D-1-DC-12-301231 should be reversed and the cause remanded for a new trial pursuant to Tex. R.App.Proc. § 44.2(b).

## Issue Number Four
### The trial court erred by admitting evidence of an opinion that Appellant understood his *Miranda* rights.

During her testimony on direct examination at guilt-innocence, Dr. Mauro testified she had reviewed the recording of the custodial interrogation of Appellant. **RR16** 33. The State asked, "Did you feel [Appellant] based on the totality of the circumstances of watching the interview was able to understand his Miranda rights?" Trial counsel objected that this was "improper" and "call[ed] for speculation on her part." The trial court overruled the objection, and Mauro answered in the affirmative. **RR16** 33-4. The trial court abused its discretion by allowing this testimony.

Much like the testimony in question above in Issue Number Three, this testimony failed to satisfy the personal knowledge requirement as well as the perception requirement for admissibility under Rules § 602. Mauro's opinion on Appellant's ability to comprehend his *Miranda* rights amounted to pure speculation and should have been excluded. *Lewis*, 402 S.W.3d at 865. The trial

60

court abused its discretion by admitting the testimony. Mauro's testimony manifestly impinged upon Appellant's substantial rights, *i.e.*, the basic rights afforded by *Miranda* and its progeny. Again, as in Issue Number Three, *above*, the record provides no assurance that this testimony did not influence the jury, or that the testimony in question had only a slight effect, and that Appellant would have been convicted even without Mauro's testimony. The judgment of conviction for the offense of Murder in cause D-1-DC-12-301231 should be reversed and the cause remanded for a new trial pursuant to Tex. R.App.Proc. § 44.2(b).

### Issue Number Five
**The trial court erred by denying a special requested instruction in the jury charge on guilt-innocence.**

During the charge conference at guilt-innocence, trial counsel submitted the following special requested instruction for inclusion in the jury charge, in light of Appellant's repeated assertions of, "I plead the Fifth:"

> During the course of his statement to law enforcement the Defendant has said "I plead the Fifth" on multiple occasions. If you have found that the Defendant's statement was given freely and voluntarily, you are instructed by the Court that you cannot consider the Defendant's statements of "I plead the Fifth" as any evidence of guilt against him.

The trial court denied the requested instruction, **RR15** 92-5; **RR16** 122-4; **RR21** CX #14.

Jury charge error is evaluated under the two-pronged test set out in *Almanza v. State*, 686 S.W.2d 157, 171 (Tex.Crim.App. 1984) (op. on reh'g). First, there is

61

an initial determination as to whether error exists. *Ngo v. State*, 175 S.W.3d 738, 743 (Tex.Crim.App. 2005). If there is error, there follows the evaluation of potential harm caused by the error. *Ngo*, 175 S.W.3d at 743. In the instant cause, because trial counsel preserved error by timely requesting the specific instruction, Appellant need only demonstrate "some harm." *Almanza*, 686 S.W.2d at 171; *Vasquez v. State*, 919 S.W.2d 433, 435 (Tex.Crim.App. 1996). Reversal is required if the error is calculated to injure the rights of the defendant. *Cornet v. State*, 417 S.W.3d 446, 449 (Tex.Crim.App. 2013).

The Supreme Court has "repeatedly recognized that 'instructing a jury in the basic constitutional principles that govern the administration of criminal justice,' is often necessary:"

> Jurors are not experts in legal principles; to function effectively and justly, they must be accurately instructed in the law. Such instructions are perhaps nowhere more important than in the context of the Fifth Amendment privilege against compulsory self-incrimination, since

> '[t]oo many, even those who should be better advised, view this privilege as a shelter for wrongdoers. They too readily assume that those who invoke it are . . . guilty of crime. . . .'

> And, as the Court has stated,

> 'we have not yet attained that certitude about the human mind which would justify us in . . . a dogmatic assumption that jurors, if properly admonished, neither could nor would heed the instructions of the trial court. . . .'

> A trial judge has a powerful tool at his disposal to protect the constitutional privilege—the jury instruction—and he has an

affirmative constitutional obligation to use that tool when a defendant seeks its employment. No judge can prevent jurors from speculating about why a defendant stands mute in the face of a criminal accusation, but a judge can, and must, if requested to do so, use the unique power of the jury instruction to reduce that speculation to a minimum.

*Carter v. Kentucky*, 450 U.S. 288, 302-3 (1981) (internal citations and footnotes omitted, ellipses in original). No adverse inferences are to be drawn from the exercise of the Fifth Amendment right to remain silent. *Griffin v. California* 380 U.S. 609, 614-15 (1965); *Carter*, 450 U.S. at 305. In the absence of the requested instruction, "the failure to limit the jurors' speculation on the meaning of that silence, when the defendant makes a timely request that a prophylactic instruction be given, exacts an impermissible toll on the full and free exercise of the privilege." *Carter*, 450 U.S. at 305. The trial court erred by refusing to include the proposed instruction as part of the charge.

Factors to consider in conducting a harm analysis include analysis of (1) the entire jury charge; (2) the state of the evidence, including the contested issues and weight of probative evidence; (3) the arguments of counsel, and (4) any other relevant information revealed by the record of the trial as a whole. *Almanza*, 686 S.W.2d at 171. The trial court's charge did include instructions on the voluntariness of Appellant's statement. **CR1** 179-80. However, trial counsel's proposed "no adverse inference" instruction addressed a separate and distinct matter, and the charge that was ultimately submitted failed to offer adequate

63

guidance on this matter. As argued above in Issue Number One, the evidence of Appellant's guilt was not overwhelming, apart from his custodial interrogation. Moreover, the State's remarks during closing arguments seemingly sought to penalize Appellant for his invocation of the right to remain silent. **RR16** 155.

The trial court should have granted the requested instruction, and its failure to do so constituted error. Without such guidance, the jury was free to infer that repeated invocations of "I plead the Fifth" were an indication of Appellant's guilt. Because it cannot be said beyond a reasonable doubt that the lack of the requested "no adverse inference" instruction did not in some way contribute to the jury's verdict, the judgment of conviction for the offense of Murder in cause D-1-DC-12-301231 should be reversed and the cause remanded for a new trial.

## **PRAYER**

WHEREFORE, PREMISES CONSIDERED, for the reasons stated above, Appellant prays that this Court find both of his convictions to be in error, and that this Court reverse the judgment of each conviction and remand the causes to the trial court for a new trial; or, in the alternative, reverse the judgment of conviction in cause D-1-DC-12-301231 and remand the cause for a new trial. Appellant prays for any and all other general relief to which he may be entitled.

Respectfully submitted,


__/s/ Paul M. Evans_____
Paul M. Evans
811 Nueces Street
Austin, Texas 78701
(512) 569-1418
(512) 692-8002 FAX
SBN 24038885
paulmatthewevans@hotmail.com


## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing

Appellant's Brief was delivered by e-service facsimile to the office of the District

Attorney of Travis County, on the 16th day of March, 2015.


___/s/ Paul M. Evans_____

Paul M. Evans


## CERTIFICATE OF COMPLIANCE

Relying on the Microsoft Word 97-2003 Document word count utility, I

hereby certify that the present document contains 13,737 words, counting all

contents specifically delineated for inclusion in the applicable word count under

Tex. Rule App. Proc. § 9.4(i)(1).

<u>   /s/ Paul M. Evans        </u>

Paul M. Evans